Rockingham
No. 98-472

THE STATE OF NEW HAMPSHIRE

v.

SETH BADER

Argued: February 6, 2002
Opinion Issued: September 13, 2002

*Philip T. McLaughlin,* attorney general (*N. William Delker,* senior assistant attorney general, on the brief and orally), for the State.

*Law Office of Paul J. Haley*, of Hillsborough (*Paul J. Haley* on the brief and orally), for the defendant.

DALIANIS, J. The defendant, Seth Bader, was convicted of first degree murder, *see* RSA 630:1-a (1996), and conspiracy to commit first degree murder, *see* RSA 629:3 (1996), in the death of his former wife, Vicki Lynn Bader, following a jury trial in the Superior Court (*Murphy*, J.). The defendant appeals both convictions and the denial of his motion for a new trial. We affirm.

This appeal has a convoluted procedural history. Following his convictions in the superior court, the defendant filed a notice of appeal, which alleged thirteen grounds for error. Subsequent to our acceptance of his appeal, the defendant filed a motion for a new trial in the superior court. We granted the defendant's motion to remand the case to the superior court so that it could decide the five issues raised in the motion for a new trial. In one issue, the defendant contended that now-Chief Justice Walter L. Murphy (Judge Murphy) should have recused himself from presiding over the defendant's trial, and he moved to recuse Judge Murphy from presiding over the motion for a new trial. After a hearing, the Superior Court (*Murphy*, J.) denied the defendant's motion to recuse.

After a subsequent hearing, the superior court rejected the remaining four issues in the defendant's post-trial motion. Thereafter, we granted the defendant's motion to amend his notice of appeal to include the five issues raised in his motion for a new trial. In his brief, however, the defendant pursued only the five issues raised in his motion for a new trial. Consequently, we limit our review to those issues, specifically: 1) recusal of the trial judge; 2) discovery of exculpatory evidence; 3) hearsay evidence; 4) alleged intra-jury misconduct; and 5) newly discovered evidence. *See State v. Bathalon*, 146 N.H. 485, 490 (2001) (issues raised in the notice of appeal, but not briefed, are deemed waived).

## I. Recusal of the Trial Judge

After the defendant was arrested in April 1997 and charged with murder and conspiracy to commit murder in the death of his former wife, the administrator of her estate brought a wrongful death suit against the defendant on behalf of the estate. The administrator also sought an *ex parte* attachment on the defendant's assets and an injunction to bar him from expending any of those assets. Judge Murphy granted the *ex parte* attachment and ordered the defendant not to make "any extraordinary expenditures" without court approval.

Judge Murphy also granted the defendant's request for an extension of time to file an objection and request for hearing on the attachment. The

attachment was later modified by agreement of the parties and the matter was deferred pending resolution of the criminal charges. In May 1997, then-Chief Justice Joseph P. Nadeau assigned all criminal, civil or equity cases involving the defendant to Judge Murphy.

Judge Murphy set bail at $750,000, an amount the defendant contends he could have met but for the previously-ordered attachment. The defendant then petitioned this court for a writ of habeas corpus in order to challenge the bail order. On September 18, 1997, we denied the defendant's petition. On the same date, the superior court was notified that the defendant's counsel in the civil cases withdrew from representation. In October 1997, the defendant's new counsel in the civil cases filed a motion for summary judgment and a motion to vacate the attachment. In November 1997, "[i]n light of the allegations contained in [the] defendant's pleadings ... [and] having been specially assigned to, and having made various rulings in the criminal case," Judge Murphy recused himself from further participation in the civil cases. At a later hearing on the status of counsel, Judge Murphy declined to discuss the merits of the defendant's argument regarding the civil cases, stating that he had recused himself "because of a writ of habeas corpus that was filed on [the defendant's] behalf, which I thought contained all kinds of misstatements."

The defendant contends that Judge Murphy's failure to recuse himself from presiding over both his trial and motion for a new trial violated his due process rights under the United States and New Hampshire Constitutions. We first address his claim under the State Constitution, *State v. Ball*, 124 N.H. 226, 231 (1983), and look to the principles of fundamental fairness, *see State v. Graf*, 143 N.H. 294, 302 (1999). Because the Federal Constitution offers the defendant no greater protection in these circumstances, we need not conduct a separate federal analysis. *See id.* Accordingly, we rely upon our State Constitution and cite federal opinions for guidance only. *Ball*, 124 N.H. at 232-33.

■ The Code of Judicial Conduct requires disqualification of a judge in a proceeding in which the judge's impartiality might reasonably be questioned and to avoid even the appearance of impropriety. *See Blaisdell v. City of Rochester*, 135 N.H. 589, 593 (1992); SUP. CT. R. 38, Canon 3C(1) (amended 2001, current version at Canon 3E(1)). "Whether an appearance of impropriety exists is determined under an objective standard, *i.e.*, would a reasonable person, not the judge himself, question the impartiality of the court." *Blaisdell*, 135 N.H. at 593.

■ The defendant argues that because Judge Murphy presided over both the tort action and the criminal proceeding, which stemmed from the same alleged transaction, his grant of the *ex parte* pre-trial attachment

necessarily meant that he found the defendant "very likely guilty of the criminal charge and . . . very likely lacking any defense." He contends that this "mindset" required Judge Murphy's recusal from the trial and the post-trial motions. Further, he contends the judge had received evidence concerning the defendant in the *ex parte* civil attachment proceeding before being assigned to the criminal matter, and that the judge had become "embroiled in mutual criticism with the defendant." He argues that Judge Murphy's statement regarding the "misstatements" in the petition for writ of habeas corpus meant that the judge had

> concluded that the defendant was not telling the truth and that he could no longer preside over the matter. . . . It is reasonable to assume that if his hostility towards the defendant stemming from the criminal matter was sufficient to recuse himself from the civil matter, it must have extended to any and all cases in which the defendant and Judge Murphy came face-to-face . . . . [O]nce bias sufficient to require recusal exists in any case, it exists in all cases involving that judge and that litigant.

We disagree.

The defendant's first argument ignores the fact that the executor of Vicki Bader's estate sought an *ex parte* attachment of his assets in order to ensure that they would be available to satisfy any potential judgment in the *civil* action. RSA 511-A:8 (1997) states, in pertinent part:

> Upon application to the court, in exceptional circumstances, an attachment may be ordered in advance of notice to the defendant if the plaintiff establishes probable cause to the satisfaction of the court of his basic right to recovery and the amount thereof and in addition thereto the existence of any of the following:
> I. There is substantial danger the property sought to be attached will be damaged, destroyed, concealed, or removed from the state and placed beyond the attachment jurisdiction of the court.

That Judge Murphy found the estate's administrator to have shown facts upon which he could determine that the administrator had a claim and that it was likely that the defendant's assets would be placed beyond the attachment jurisdiction of the court does not mean that the court found the defendant both "very likely guilty" of, and lacking any defense to, the *criminal* charge. While the civil and criminal cases were grounded in the same facts, they cannot be equated, and the defendant's argument ignores

the different standards and burdens of proof germane to each. We find the defendant has failed to show any evidence of Judge Murphy having acquired the "mindset" to which the defendant refers.

The defendant's remaining arguments also fail to demonstrate that Judge Murphy erred in not recusing himself from hearing the criminal trial or post-trial motions. In *State v. Fennelly*, 123 N.H. 378 (1983), we stated that, due to the probability of unfairness, a *per se* rule of disqualification applies when a judge "has pecuniary interests in the outcome, . . . has become personally embroiled in criticism from a party before him, . . . has heard evidence in secret at a prior proceeding, or . . . is related to a party." *Fennelly*, 123 N.H. at 384 (quotation omitted). None of these factors is present here.

That the judge may have received evidence concerning the defendant in connection with the *ex parte* attachment petition before being assigned to the criminal matter does not rise to the level of "hearing evidence in secret at a prior proceeding." Hearing evidence in secret refers to a trial judge acting as a "one-man grand jury" with the power to compel witnesses to appear before the judge in secret to testify about suspected crimes. *See State v. Aubert*, 118 N.H. 739, 741 (1978); *see also In re Murchison*, 349 U.S. 133, 133-34 (1955). No such situation existed in this case. While an *ex parte* attachment petition was filed, there was no secrecy involved. The defendant was afforded the opportunity to object and request a hearing. The attachment was subsequently modified by agreement of the parties. Further, the fact that the proceedings in the civil case preceded hearings in the criminal case does not change our view. We have stated that:

> Judges are quite able to put aside information gained at the time of a plea and to decide the case solely on the evidence presented at the subsequent hearings. Even judges and jurors who have in fact formed opinions prior to trial are not disqualified if they can set aside their opinions and decide the case on the evidence before them.

*Aubert*, 118 N.H. at 741. In addition:

> Also not subject to deprecatory characterization as "bias" or "prejudice" are opinions held by judges as a result of what they learned in earlier proceedings. It has long been regarded as normal and proper for a judge to sit in the same case upon its remand, and to sit in successive trials involving the same defendant.

. . . .

> [J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion. . . . [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.

*Liteky v. United States*, 510 U.S. 540, 551, 555 (1994). "Adverse rulings against the defendant in the same or a prior judicial proceeding do not render the judge biased." *Matter of Hipp, Inc.*, 5 F.3d 109, 116 (5th Cir. 1993); *see Douglas v. Douglas*, 143 N.H. 419, 429 (1999).

The defendant has also failed to show that Judge Murphy was "personally embroiled in criticism from a party before him" or was "hostile" towards the defendant in any of the proceedings. Our review of the extensive record in this case found no evidence that Judge Murphy had, in any way, become embroiled in mutual criticism with the defendant. The defendant, in his petition for writ of habeas corpus, had criticized Judge Murphy's earlier rulings regarding bail. Judge Murphy had indicated that the defendant's petition contained misstatements. Neither fact, however, illustrates that Judge Murphy had either engaged in or become embroiled in personal criticism of the defendant. The one-sided personal criticism of a judge by a defendant does not equate to personal criticism of the defendant by the judge. Further, a judge's belief that a petition, filed on behalf of a defendant, contained misstatements is not equivalent to a showing of personal hostility towards the defendant. In sum, we find no violation of the defendant's right to due process in Judge Murphy's presiding over both his trial and his motion for a new trial.

## II. Discovery of Exculpatory Evidence

Vicki Bader and the defendant were married in 1991 and divorced in 1994. They had three children; Joseph, who was adopted, was fourteen years old at the time of Vicki Bader's death. In November 1997, the State filed a juvenile delinquency petition against Joseph Bader, alleging his participation in the conspiracy to murder Vicki Bader. In December 1997, the State and Joseph Bader entered into a negotiated plea agreement whereby Joseph pled true to the delinquency petition. The defendant maintains that Joseph murdered Vicki Bader in exchange for sexual favors

from the defendant's former fiancée, Mary Jean Martin, and that Joseph committed perjury in testifying that his father killed Vicki Bader.

The defendant contends that he was denied full access to possibly exculpatory information known to the State concerning his son Joseph in violation of his due process rights under the United States and New Hampshire Constitutions. We first address his claim under the State Constitution. *Ball*, 124 N.H. at 231. Because the Federal Constitution offers the defendant no greater protection in this context, we need not conduct a separate federal analysis. *See State v. Dewitt*, 143 N.H. 24, 33 (1998). Accordingly, we rely upon our State Constitution and cite federal opinions for guidance only. *Ball*, 124 N.H. at 232-33.

The defendant argues that the "facts" surrounding Joseph Bader's plea agreement "are susceptible to an inference that there was a *de facto* contingency fee [testimony] agreement with Joseph, under which the exact extent of [the State's leniency] would depend on just how well his testimony at the defendant's trial pleased the State." Further, the defendant argues that the State either withheld discovery concerning a "leniency-for-testimony agreement" with Joseph Bader, or the State failed to notify the trial judge that Joseph, a prosecution witness, had offered false testimony concerning the agreement.

In October 1997, the superior court granted the defendant's motion for disclosure of all agreements between the State and any of his co-defendants. In January 1998, the court granted the State's *ex parte* motion for authorization to disclose all juvenile records of Joseph Bader to the defense in satisfaction of its discovery obligations. The State's motion included copies of the State's agreement with Joseph Bader, as well as all related pleadings and orders from the Brentwood Family Division (Family Division). The defendant followed the State's motion by filing a second motion in March 1998, and making an oral motion during his trial in April 1998, for discovery of any agreements between the State and Joseph Bader. In large part, the court granted the motions, and proceeded to conduct an *in camera* review of all materials submitted by the Family Division and the division for children, youth and families (DCYF). *See State v. Gagne*, 136 N.H. 101, 105 (1992) (providing for review of privileged or confidential records where defendant has established reasonable probability that the records contain information that is material and relevant to his defense). The court found that the materials, which included Joseph Bader's therapist's notes, contained "no information which is exculpatory, essential to the defendant receiving a fair trial, or which relate [*sic*] to any understandings or agreements relative to plea decisions or other information which can be construed as *Giglio* materials." *See Giglio v. United States*, 405 U.S. 150, 154-55 (1972) (jury entitled to know

of evidence of any understanding or agreement as to a future prosecution of key witness).

Following a hearing on April 10, 1998, the court ordered the State to inquire of DCYF as to any decisions made relative to any agreement that there be no contact between Joseph Bader and his juvenile service officer and to report the results of the inquiry to the defendant's counsel. Further hearings were held on April 13, 1998, regarding Joseph Bader's plea and the court granted the defendant's request for an expedited transcript of Joseph's plea hearing in the Family Division. Both the court and counsel had earlier reviewed the tape recording of the plea hearing. Subject to further review after the transcript was made available, the trial court found no evidence of any "sine qua non" for Joseph Bader's testimony.

At his trial, the defendant was permitted to cross-examine Joseph Bader regarding the terms and his understanding of his plea agreement, even if that understanding differed from the actual agreement. During cross-examination, Joseph also testified regarding his understanding that his plea agreement was not dependent upon his "performance" during the defendant's trial, and that his testimony was not a condition of his juvenile disposition.

■ There is no evidence in the extensive record in this case to support a conclusion that the trial court erred either in its finding following the *in camera* review or in its finding of no evidence of a "sine qua non" on the part of the State in return for Joseph Bader's testimony. *See State v. Wallace*, 146 N.H. 146, 148 (2001) ("In reviewing the trial court's ruling, we accept its factual findings unless they lack support in the record or are clearly erroneous."). Accordingly, the defendant cannot prevail in his effort to secure a new trial on this issue as he has failed to "prove that the prosecution withheld evidence that is favorable and material." *Dewitt*, 143 N.H. at 33.

*III. Hearsay Evidence*

Dr. James Fieseher was Vicki Bader's physician from July 1992 until August 1996. At trial, the State elicited testimony from Dr. Fieseher that Vicki Bader had begun to put on weight from October of 1993 and that, at the time of her death, she was "obese." Dr. Fieseher also testified that Vicki Bader saw him for a physical examination in July 1995, and was "interested in her health" and in what "she could do to get her blood pressure under control." In addition, he testified that she told him "one of the reasons that she was so heavy, was the fact that it would make her body more difficult to move once she was killed." The doctor testified that Vicki Bader thought the defendant was going to kill her and she envisioned

him trying to move her body. The court twice instructed the jury to disregard the references to the defendant. The court admitted the hearsay statements concerning Vicki's reasons for her added weight under New Hampshire Rule of Evidence 803(4), ruling that the statements were "made for the purposes of medical diagnosis or treatment," and finding that there was "an indicia of reliability to them."

On appeal, the defendant contends that the admission of Dr. Fieseher's testimony violated the Confrontation Clause of the Sixth Amendment of the United States Constitution because the hearsay was from an unavailable and mentally ill declarant and accused the defendant of an element of the charged crime. While the defendant initially raised an objection to the State's notification of its intent to introduce Dr. Fieseher's testimony based upon Part I, Article 15 of the New Hampshire Constitution and the Fifth Amendment to the United States Constitution, his December 1999 motion for new trial, his January 2001 supplementary memorandum on this issue, and his brief rely solely upon a Sixth Amendment challenge. Accordingly, we limit our constitutional analysis to the defendant's Sixth Amendment challenge. Although the defendant's argument is by no means clear, we read it to encompass both a claim of trial court error in admitting the physician's statements under Rule 803(4) and a constitutional violation.

We first turn to the defendant's claim that the trial court erred in admitting Dr. Fieseher's testimony concerning Vicki Bader's statements under Rule 803(4). We will not reverse a trial court's ruling on the admissibility of evidence absent an unsustainable exercise of discretion. *State v. Soldi*, 145 N.H. 571, 576 (2000); *see State v. Lambert*, 147 N.H. 295, 296 (2001) (explaining unsustainable exercise of discretion standard).

"The rule against hearsay holds that hearsay evidence is generally inadmissible, subject to certain well-delineated exceptions." *Soldi*, 145 N.H. at 575 (quotation omitted). Rule 803(4) excepts from the rule against hearsay:

> Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment, regardless of to whom the statements are made, or when the statements are made, if the court, in its discretion, affirmatively finds that the proffered statements were made under circumstances indicating their trustworthiness.

"The underlying purpose of this exception is that statements made with the purpose of obtaining medical attention in the form of diagnosis or treatment are inherently reliable because such statements are made usually with the motivation to obtain an accurate diagnosis or proper treatment; there is normally no incentive to fabricate." *Id.* at 575-76 (quotation omitted).

█ There are three areas of inquiry for a court in determining the admissibility of evidence under Rule 803(4): the declarant's intent; the subject matter of the statements; and whether there are circumstances indicating the trustworthiness of the statements. *State v. Roberts*, 136 N.H. 731, 740 (1993).

Dr. Fieseher testified, among other things, to the following. He was Vicki Bader's personal and family physician from July 1992 through August 1996. Vicki Bader was in relatively good health until October 1993, when she began to suffer from a variety of medical problems, including stomach pain, headaches, difficulty sleeping, elevated blood pressure and weight gain. Over the course of his first three years as Vicki Bader's physician, Dr. Fieseher treated her during eighteen office visits and four hospitalizations. Three of those hospitalizations resulted from suicide attempts, the first by drug overdose in January 1995. While hospitalized, Vicki Bader told Dr. Fieseher that the breakdown in her health was caused by her battle with the defendant over the custody of their three children. The custody dispute with the defendant included daily harassing telephone calls from him, which caused overeating, difficulty in sleeping and an extreme loss of self-esteem; the dispute had a "direct effect on her health." Dr. Fieseher treated Vicki Bader after two subsequent suicide attempts in March 1995 and June 1995.

█ "A court must find first that the declarant intended to make the statements to obtain a medical diagnosis or treatment. This finding may be based upon circumstantial evidence." *Id.* (citation omitted). The statements at issue were made during an office visit in July 1995. Dr. Fieseher testified that he saw Vicki Bader at that time for her first physical in her three years as his patient, as she was "interested in her health" and "interested in what she could do to get her blood pressure under control." "[O]ne can infer that a person who voluntarily visits a doctor intends to obtain medical attention . . . ." *Id.* at 741. Dr. Fieseher ordered exercise and proper diet in response to her conditions. He further testified that "[Vicki Bader] told [him] that the reason she was so heavy, or one of the reasons that she was so heavy, was the fact that it would make her body more difficult to move once she was killed." He also testified that her overeating was the manner in which "she dealt with depression, it was

the way she dealt with stress." Between the July 1995 office visit and August 1996, Vicki Bader had five more office visits, three of which were for "normal checkups." Dr. Fieseher testified that her condition began to improve, that she began to lose weight in August 1996, and that she was "more self-assured than [he'd] seen her in about three years." We conclude that the trial court did not err in inferring from all the relevant facts that Vicki Bader intended to make the statements at issue in order to obtain medical diagnosis and treatment.

"To be admissible, the statements must describe medical history, or symptoms, pain, sensations, or their cause or source to an extent reasonably pertinent to diagnosis or treatment." *Id.* (quotation omitted). Based upon Dr. Fieseher's testimony, we conclude that the trial court could find that the statements at issue described a cause or source for Vicki Bader's overeating and weight gain.

The final test regarding the statements' admission under Rule 803(4) is whether circumstances indicate that the statements are trustworthy. *Id.* at 737. "We have held that statements made to a physician are trustworthy, in part, because of the duration of the relationship between the doctor and patient." *State v. White*, 145 N.H. 544, 556 (2000), *cert. denied*, 533 U.S. 932 (2001). Dr. Fieseher had been Vicki Bader's personal and family physician for three full years when she made the statements at issue. Over that time, he had treated her during eighteen office visits and four hospitalizations, three of which followed suicide attempts. "The guarantee of trustworthiness is that no one would willingly risk medical injury from improper treatment by withholding necessary data or furnishing false data to the physician who would determine the course of treatment on the basis of that data." *Soldi*, 145 N.H. at 577 (quotation omitted). We conclude there were adequate circumstances indicating the trustworthiness of the statements at issue and that the trial court's admission of the statements under Rule 803(4) was not an unsustainable exercise of discretion.

The defendant argues that the trial court erred in admitting Vicki Bader's statements because: 1) she was refusing treatment for her obesity; 2) her statements were offered to prove that the defendant had formed the intent to kill his wife; 3) "accusations of personal fault" do not fall within the medical diagnosis exception to the rule against hearsay; and 4) her accusations against him were not based upon her personal knowledge and were "purporting to predict the future" in violation of New Hampshire Rules of Evidence 602 and 701. We find no merit in these arguments. Our review of Dr. Fieseher's testimony reveals no evidence that Vicki Bader refused treatment for her obesity. Rather, his testimony was clear that Vicki Bader indicated a "resistance to losing weight" prior to the July 1995 office visit, but that she came to the office visit "interested in her health"

and "interested in what she could do to get her blood pressure under control." In response, Dr. Fieseher advised her that exercise and proper diet were the two best things she could do to keep her weight, blood pressure, headaches and insomnia under control. He also testified that when he last saw her in August 1996, subsequent to his orders for exercise and proper diet, Vicki Bader was "in control," "more self-assured" and had started to lose weight. The defendant's second, third and fourth arguments concerning her "accusations" ignore the fact that the trial court struck the references to the defendant from Dr. Fieseher's testimony concerning Vicki Bader's weight gain and twice instructed the jury to disregard the same.

At oral argument, the defendant argued that the admission of Dr. Fieseher's testimony was "clearly prejudicial." The State countered that the defendant had failed to raise an argument based upon unfair prejudice or New Hampshire Rule of Evidence 403 prior to oral argument. We agree. The defendant failed to raise this argument either at trial, in his motion for a new trial, or in his brief. Accordingly, we decline to address it. *See State v. Scovill*, 144 N.H. 409, 414 (1999).

■ We next turn to the defendant's claim that the admission of Dr. Fieseher's testimony violated his rights under the Confrontation Clause of the Sixth Amendment. When deciding whether the admission of a declarant's out-of-court statements violates the Confrontation Clause, appellate courts review the presence or absence of historical facts for clear error and independently review whether the government's proffered guarantees of trustworthiness satisfy the demands of the Clause. *Lilly v. Virginia*, 527 U.S. 116, 136-37 (1999).

■ The United States Supreme Court has set forth a general approach for determining whether statements properly admitted under an exception to the hearsay rule also meet the requirements of the Sixth Amendment Confrontation Clause. The "statement is admissible only if it bears adequate indicia of reliability. Reliability can be inferred *without more* in a case where the evidence falls within a firmly rooted hearsay exception." *Idaho v. Wright*, 497 U.S. 805, 814-15 (1990) (quotations omitted; emphasis added); *see State v. Cook*, 135 N.H. 655, 667-68 (1992) (Thayer, J., concurring specially). The Court has held that the medical diagnosis or treatment exception is a firmly rooted hearsay exception. *White v. Illinois*, 502 U.S. 346, 355 n.8 (1992); *see United States v. George*, 960 F.2d 97, 99 (9th Cir. 1992). Consequently, because the statements were properly admitted under a firmly rooted hearsay exception, adequate indicia of reliability were present and their admission did not violate the defendant's rights under the Confrontation Clause of the Sixth Amendment.

*IV. Alleged Intra-Jury Misconduct*

On the morning of the third day of jury deliberations, two court bailiffs reported to the trial judge that two jurors had approached them and asked to see the judge. The judge held a chambers conference with counsel, where the bailiffs reported that the jurors were "extremely upset and almost to the point of tears." The jurors had complained that the jury foreperson was not submitting questions they desired answered to the court. During the chambers conference, a question was received from the jury asking, "[I]f we have reached a unanimous verdict on one of the two charges, do we need to inform you of that fact, or do we wait until we have a decision on both charges?" The defendant asked the court to interview the two jurors to determine "what compelled them to seek the court's assistance and what questions they had that were not answered" and moved for a mistrial. The State objected to both the motion for mistrial and the individual *voir dire*, arguing that there had been no showing of prejudice to justify a mistrial and that, given the circumstances, *voir dire* would impermissibly invade the deliberative process of the jury. The court denied the motion for a mistrial and declined to speak directly with the two jurors. Instead, the judge sent a note to the jury instructing it to continue its deliberations until both verdicts had been determined, and that "if any of the jurors have any other questions, please make certain that they are sent to me for response."

The following afternoon, the jury returned unanimous guilty verdicts against the defendant on both charges. At the defendant's request, the jurors were polled individually; they confirmed the unanimous guilty verdicts. After the jury returned to the deliberation room, the defendant again moved for individual *voir dire* of the two jurors who had earlier complained that the jury foreperson was not bringing their questions to the court's attention. Defendant's counsel represented that one of the two jurors in question "was in tears" while leaving the courtroom. The trial court denied the motion.

In its March 2001 order denying the defendant's motion for a new trial, the trial court stated it was satisfied that any concerns regarding jurors' questions not being relayed to the court were "alleviated" by the court's supplemental answer to the jury's question during the trial. Because the jury submitted no further questions, there was no evidence of prejudice, and individual polling confirmed the jury's unanimous verdicts, the trial court found that the foreperson's conduct did not prejudice the deliberations. Consequently, the court found that the defendant's allegations of juror misconduct did not warrant *voir dire* during the trial.

On appeal, the defendant contends the trial court's failure to conduct *voir dire* of the two jurors violated his right to be tried by a fair and impartial jury under Part I, Article 15 of the State Constitution, and the Sixth and Fourteenth Amendments to the United States Constitution. We first address the defendant's claims under the State Constitution. *See Ball*, 124 N.H. at 231.

"It is axiomatic that a defendant has a right to be tried by a fair and impartial jury." *Bathalon*, 146 N.H. at 487. At oral argument, the defendant proffered that *State v. Rideout*, 143 N.H. 363 (1999), should apply in reviewing the trial court's actions. We disagree. *Rideout* dealt with the trial court's role in investigating "a colorable claim that a jury may be biased or tainted by extrinsic contact or communication." *Id.* at 365. When such a colorable claim is made, the court "must undertake an adequate inquiry to determine whether the alleged incident occurred and, if so, whether it was prejudicial." *Id.*; *cf. United States v. Gaston-Brito*, 64 F.3d 11, 12 (1st Cir. 1995) ("[W]hen a nonfrivolous suggestion is made that a jury may be biased or tainted by some incident, the [trial] court must undertake an adequate inquiry to determine whether the alleged incident occurred and if so, whether it was prejudicial."). In *Gaston-Brito*, the court dealt with a claim that the jurors were prejudiced by an extrinsic non-verbal communication at trial between a witness and a law enforcement agent sitting at the prosecution table. The defendant has made no claim of extrinsic contact or communication in this case.

Instead, the defendant has alleged that intra-jury misconduct prejudiced his right to a fair trial. As such, the defendant has the burden of proving actual prejudice. *See Bathalon*, 146 N.H. at 488. Under the facts of this case, the defendant has failed to meet this burden. Absent proof of actual prejudice, it was within the trial court's discretion to determine the nature and extent of its inquiry into the situation. *See id.*; *Gaston-Brito*, 64 F.3d at 12. We review that fact-specific determination for an unsustainable exercise of discretion. *See Bathalon*, 146 N.H. at 488; *Gaston-Brito*, 64 F.3d at 13; *Lambert*, 147 N.H. at 296 (explaining unsustainable exercise of discretion standard).

In order to address the possibility of juror misconduct, the trial judge unambiguously instructed the jury to forward to him any questions any of the jurors might have for a response. "[O]ur system of justice is premised upon the belief that jurors will follow the court's instructions." *State v. Smart*, 136 N.H. 639, 658, *cert. denied*, 510 U.S. 917 (1993). Although the bailiffs reported that two jurors complained that the jury foreperson was not submitting their questions to the court, a question from the jury was received less than one hour later. There were no

subsequent communications reported from the two jurors. After the verdicts were announced, the court polled the jurors individually, as an additional safeguard. Each juror confirmed the unanimous guilty verdicts and gave no indication of juror misconduct. *See People v. Goode,* 707 N.Y.S.2d 3, 4 (App. Div. 2000) (defendant's motion to set aside the verdict, alleging juror misconduct, was properly denied, without hearing, especially where juror, who complained of coercion by other jurors, confirmed her verdict upon polling of the jury); *United States v. Camacho,* 865 F. Supp. 1527, 1536 (S.D. Fla. 1994) (polling all the jurors specifically and individually reinforces the message of unanimity in the jury's decision as building from each juror's individual decision as to the defendant's guilt or innocence); *cf. United States v. Paniagua-Ramos,* 135 F.3d 193, 199 (1st Cir. 1998) ("Polling is useful to indicate an irregularity in a verdict. However, the failure of a poll to indicate coercion is not conclusive as to whether coercion actually existed." (citations omitted)).

Based upon our review of the process followed by the trial court and its findings, we cannot conclude that the trial court's inquiry into the alleged juror misconduct, including the decision not to conduct individual juror *voir dire,* was an unsustainable exercise of discretion. *See State v. Smith,* 123 N.H. 46, 50 (1983) ("A trial judge has broad discretion in deciding whether to *voir dire* the jury on a given subject."); *Smart,* 136 N.H. at 659 ("The decision to *voir dire* or poll the jury after its verdict is within the discretion of the trial court."). Accordingly, we find no violation of the defendant's right to be tried by a fair and impartial jury under the New Hampshire Constitution.

We next address the defendant's claims under the Federal Constitution.

> When a colorable claim of jury misconduct surfaces, the [trial] court has broad discretion to determine the type of investigation which must be mounted. The trial judge may, but need not, convene a fullblown evidentiary hearing. Rather, his primary obligation is to fashion a responsible procedure for ascertaining whether misconduct actually occurred and if so, whether it was prejudicial.
>
> . . . So long as the [trial] judge erects, and employs, a suitable framework for investigating the allegation and gauging its effects, and thereafter spells out his findings with adequate specificity to permit informed appellate review, his determination that the jury has not been soured deserves great respect and should not be disturbed in the absence of a patent abuse of discretion.

*United States v. Boylan*, 898 F.2d 230, 258 (1st Cir.) (citations, quotation, brackets and ellipsis omitted), *cert. denied*, 498 U.S. 849 (1990); *cf. United States v. Cruz*, 156 F.3d 22, 28 (1st Cir. 1998) ("non-frivolous" suggestion of jury bias or taint), *cert. denied*, 526 U.S. 1124 (1999); *Gaston-Brito*, 64 F.3d at 12-13.

 After completing the procedures detailed above, Judge Murphy found that the foreperson's alleged misconduct "did not prejudice the deliberations." Even if, in fact, the foreperson had refused to submit individual juror's questions to the court, we cannot say it would have been an abuse of discretion for the trial court to decide not to conduct individual juror *voir dire. See Camacho*, 865 F. Supp. at 1533 (affidavits of two jurors reporting that the foreperson refused to submit jurors' messages to the court not a basis for granting juror interviews). Consequently, we find no violation of the defendant's right to be tried by a fair and impartial jury under the United States Constitution.

## V. Newly Discovered Evidence

The State's indictments alleged that the defendant murdered his former wife as part of a conspiracy consisting of the defendant; Mary Jean Martin, his former fiancée; Joseph Bader, his son; and Sandro Stuto, an associate of Martin. During the trial, Stuto testified that he was present, in the role of backup shooter, when the defendant murdered Vicki Bader. He also testified that he disposed of her motor vehicle after the murder and that Martin paid him approximately $6,000 to commit these acts. After the defendant was convicted, he learned that Stuto had allegedly recanted his trial testimony to a fellow prison inmate, referred to as "John Doe" (Doe). In filing his motion for a new trial, the defendant included an affidavit from Doe, detailing several conversations between Doe and Stuto regarding the defendant, Vicki Bader and Martin.

Specifically, Doe's affidavit stated that Stuto had told him that he was working with Martin, who was attempting to swindle funds from the defendant; that Martin pretended to be the defendant's girlfriend for the purpose of obtaining money and housing; that Martin intended to marry the defendant in order to get his money; and that Martin was very upset that the defendant was paying support to his former wife. According to Doe's affidavit, Stuto also said he had been enlisted by Martin to assist her in obtaining money from the defendant and that Martin was attempting to defraud relatives of the defendant. Finally, the Doe affidavit stated, "Mr. Stuto further informed me that Mary Jean Martin enlisted his assistance to kill Vicki Bader and that Seth Bader did not have anything to do with killing his ex-wife."

In its March 2001 order denying the defendant's motion for a new trial, the trial court found the "allegedly newly discovered evidence," that Stuto had testified falsely at trial, would be admissible only to impeach Stuto's previous testimony. Further, the trial court found the evidence to be cumulative of other evidence already presented by the defendant in support of his theory that Martin had planned Vicki Bader's murder, and "not of such a character that it would likely produce a different result at trial." Citing *State v. Kelly*, 120 N.H. 904 (1980), and RSA 526:1, the trial court ruled "that there was no miscarriage of justice at the original trial and the alleged newly discovered evidence does not justify a new trial."

On appeal, the defendant contends the trial court erred in failing to grant his motion for a new trial in the face of the newly discovered evidence of Stuto's recantation. The defendant also contends that the trial court's failure to conduct an evidentiary hearing in light of the newly discovered evidence, or to grant his motion for a new trial if a different verdict "might" result, violated his right to due process under the Federal Constitution.

In order to prevail on a motion for a new trial on the ground of newly discovered evidence, the defendant must show that: 1) he was not at fault for not discovering the evidence at the former trial; 2) the evidence is admissible, material to the merits and not cumulative; and 3) the evidence is of such a character that a different result will probably be reached upon another trial. *State v. Mills*, 136 N.H. 46, 51 (1992); *see Kelly*, 120 N.H. at 906. "Recanted testimony is a species of newly discovered evidence for purposes of a new trial motion." *Mills*, 136 N.H. at 51; *cf. United States v. Natanel*, 938 F.2d 302, 313 (1st Cir. 1991) ("Evaluating such a motion calls into play the presider's sense of the ebb and flow of the recently concluded trial. For that reason, the [trial] court must be given wide rein to assess the evidence and judge the credibility of witnesses. Its decision will not be overturned on appeal except for a manifest abuse of discretion."), *cert. denied*, 502 U.S. 1079 (1992).

With regard to the first prong of the test, the defendant's lack of fault for not discovering the evidence at his trial in 1998 is not at issue, as the John Doe affidavit did not exist until August 1999. With regard to the second prong, the trial court found that evidence of Stuto's recantation to a fellow inmate would be admissible only to impeach Stuto's previous testimony, and was cumulative of other evidence already presented in support of the defendant's theory that Martin had planned Vicki Bader's murder.

"Cumulative evidence is defined as additional evidence of the same kind to the same point. Evidence which goes to a point upon which no

evidence was adduced at the former trial is not cumulative." *State v. Davis*, 143 N.H. 8, 12 (1998) (quotation omitted). With regard to all of the substantive statements in the John Doe affidavit, with the exception of the single statement that "Seth Bader did not have anything to do with killing his ex-wife," we agree they are consistent with the trial testimony of Stuto and other witnesses. As such, the statements are cumulative of other evidence presented at trial and support the defendant's theory that Martin had planned Vicki Bader's murder. Accordingly, we need not address the defendant's arguments regarding the admissibility of the statements. Even if we assume that the statements were admissible, the cumulative nature of the statements dictates that the defendant has failed to meet the second prong of the newly discovered evidence test with regard to them.

With regard to the critical substantive statement in the John Doe affidavit, that "Seth Bader did not have anything to do with killing his ex-wife," we turn our attention to the third prong of the test to determine if the defendant has shown that the newly discovered evidence is of such a character that a different result would probably be reached in another trial. The defendant contends that his convictions were built on the testimony of his "two alleged accomplices," Sandro Stuto and Joseph Bader. The defendant further contends that the John Doe affidavit, detailing Stuto's alleged recantation of his trial testimony, is evidence of Stuto's perjury at trial, that Stuto's perjury dictates that Joseph Bader's testimony was perjured, and that he is, therefore, actually innocent. We disagree.

"It is a question of fact for the trial court as to whether newly discovered evidence suggesting perjury by a prosecution witness demands a new trial. Where the overriding question is the possible impact of newly discovered evidence on the credibility of a key prosecution witness, we must affirm the findings of the trial court so long as there is evidence to support them." *State v. Williams*, 142 N.H. 662, 668-69 (1998) (citation, quotation and brackets omitted). Here, the trial court found that the evidence, which the defendant sought to introduce through the John Doe affidavit, was "not of such a character that it would likely produce a different result at trial." The John Doe affidavit, from an anonymous convicted felon at the State Prison, contains eight substantive statements, seven of which are consistent with the trial testimony of Stuto and other witnesses. Although the eighth statement (that Stuto informed John Doe that the defendant had nothing to do with killing Vicki Bader) is not consistent with the trial testimony, the trial judge heard the testimony of Stuto and Joseph Bader, both of whom testified that the defendant shot and killed Vicki Bader, and had the opportunity to evaluate the credibility

of both over the collective eight days of their testimony. *Cf. Mills*, 136 N.H. at 51 ("When the purported new evidence is a recantation by a prosecution witness, the third prong of this test will not be met if the trial judge finds as a threshold matter that the recantation is not credible."); *Natanel*, 938 F.2d at 314 ("For newly discovered evidence to warrant a retrial in a criminal case, the existence of the required probability of reversal must be gauged by an objectively reasonable appraisal of the record as a whole, not on the basis of wishful thinking, rank conjecture, or unsupportable surmise."). Accordingly, we cannot say that the trial court erred in its finding that the statement of John Doe was not of such a character that it would likely produce a different result at trial.

As the defendant has failed to meet either the second or third prongs of the newly discovered evidence test with regard to all of the statements in the John Doe affidavit, we find no error in the trial court's denial of the defendant's motion for a new trial.

The defendant contends that our State cases, which hold that in order to prevail on a motion for new trial, a defendant must show that newly discovered evidence is of such a character that a different result will *probably* be reached upon another trial, "may no longer be good law." Citing *State v. Boisvert*, 119 N.H. 174 (1979), as one of these "older" cases, the defendant notes that *Boisvert* cites to *United States v. Strauss*, 443 F.2d 986 (1st Cir.), *cert. denied*, 404 U.S. 851 (1971), and contends that *Strauss* suggests a different test — that of the "possibility of a different verdict" — is the appropriate test if the "newly discovered evidence of perjury applied to a material issue." We disagree. Although *Boisvert* does cite to *Strauss*, it is not in support of a "possibility" test. *See Boisvert*, 119 N.H. at 176-77. More important, *Strauss* simply notes the two different standards and recognizes that the circuit courts are divided in applying the two different tests. *Strauss*, 443 F.2d at 989 & n.3.

We turn our attention to the defendant's federal due process claim and assume, without deciding, that he has preserved the claim. Nonetheless, we find no merit in his claim. The defendant cobbles his due process argument together from his reading of *Napue v. Illinois*, 360 U.S. 264 (1959), and *Natanel*. He correctly cites *Napue* for the proposition that federal due process is violated if a State knowingly uses false evidence, including false testimony, to obtain a tainted conviction, regardless that the false testimony goes only to the credibility of the witness. *Id.* at 269. The defendant then cites *State v. Yates*, 137 N.H. 495 (1993), as this State's "progeny" of *Napue*. *Yates* does recognize *Napue* as the relevant law governing that case, *id.* at 498, but we concur with Judge Murphy that the defendant's reliance upon *Yates* is "misplaced," as "[t]hat case provides that a new trial is warranted where the prosecution knowingly presented

false or perjured testimony. There is no basis for such a conclusion in this case." The defendant then contends that "perjury recanted after trial triggers the same due process issue as perjury discovered during trial," citing *Natanel* as one in "a line of cases that expressly or implicitly apply the *Napue* doctrine to the situation where perjury becomes apparent after a verdict." The defendant states that *Natanel* held that a new trial is required if newly discovered impeachment evidence tends to show perjury by a prosecution witness which "might have affected the verdict," a less stringent test than the "would have affected verdict" test for other types of newly discovered evidence. He acknowledges that *Natanel* does not mention "constitutional due process," but argues that "*Natanel* should be viewed in the light of parallel cases elsewhere that do hold post-verdict discovery of prosecution witness perjury to be a due process issue." We decline the defendant's invitation as we disagree with his reading of both *Natanel* and the "parallel cases" cited.

We agree that *Natanel* does not address due process. Rather, it deals with the proper standard for granting or denying a motion for new trial based upon newly discovered evidence. Indeed, *Natanel* confirms that the proper standard for the final prong of the test is that the newly discovered evidence "will probably result in an acquittal upon retrial of the defendant." *Natanel*, 938 F.2d at 313 (quotation omitted). The First Circuit observed that only in cases where newly discovered evidence is offered to impeach the credibility of a witness, and when the trial court is satisfied that the defendant has shown the testimony was "deliberately false," should the trial court apply the less stringent standard of whether "without the false testimony the jury *might* have reached a different conclusion." *Id.* (quotation omitted).

With regard to the "parallel cases" cited by the defendant in support of his due process argument, all are readily distinguishable from the instant case. In *Lewis v. Erickson*, 946 F.2d 1361 (8th Cir. 1991), "the outcome of the trial depended almost entirely on whether the jury believed the victim's or [the defendant's] testimony." *Id.* at 1362. Given the victim's recantation of her identification testimony, the Eighth Circuit remanded the case to the trial court with directions to grant a writ of habeas corpus. *Id.* at 1362-63. In the case at hand, however, the defendant did not testify in his own defense. Even if Stuto's entire testimony were disregarded, the jury would still have the testimony of Joseph Bader that the defendant had shot and killed Vicki Bader to consider. *Lewis* also recognized the "probably produce an acquittal on retrial" standard. *Id.* at 1362.

In *Cornell v. Nix*, 921 F.2d 769 (8th Cir. 1990), the State's case rested primarily on the testimony and credibility of the defendant's two half-brothers and on the corroboration testimony of a third man. *Id.* at 770.

When the third man recanted his corroboration testimony, but the information was not revealed to the defense at the time of the defendant's postconviction proceedings, the Eighth Circuit reversed the defendant's conviction and remanded the case for an evidentiary hearing. The court reasoned that the recantation warranted further inquiry where the testimony "was crucial to the prosecution's case, coupled with the length [twenty-one hours] of the jury deliberations followed by the *Allen* instruction." *Id.* at 771; *see Allen v. United States*, 164 U.S. 492, 501-02 (1896) (Court approved supplemental instructions advising jurors in a deadlock to have proper deference for each other's opinions). *Cornell* also recognized the "probably produce an acquittal on retrial" standard. *Cornell*, 921 F.2d at 771.

In *Sanders v. Sullivan*, 863 F.2d 218 (2d Cir. 1988), the defendant's conviction was predicated on the testimony of a husband and wife. After his wife died, the husband recanted his testimony and revealed the same to the then-incarcerated defendant. *Id.* at 219. In his appeal of a denial of his petition for writ of habeas corpus, the defendant asserted that the prosecutor had knowingly used false testimony to obtain his conviction. *Id.* The Second Circuit remanded the case to the trial court for an evidentiary hearing to determine the credibility of the recantation, *id.* at 227, but stated:

> [W]e do not believe that due process demands a hearing to determine the credibility of every recantation of testimony. Only recantations of material testimony that would most likely affect the verdict rise to the level of a due process violation, if a state, alerted to the recantation, leaves the conviction in place.
>
> . . . .
>
> [I]t is our belief that the perjured testimony which will trigger a due process violation must be of an extraordinary nature. It must leave the court with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.

*Id.* at 225-26. In addition to the "most likely" standard, *Sanders* also recognized the standard that "new evidence be so material that it would probably cause a result of acquittal upon retrial." *Id.* at 225 (quotation omitted). The court acknowledged the less stringent standard of "might alter the verdict of the jury," but limited the application of that standard to cases alleging the "prosecutor's knowing use of false testimony." *Id.* We

reiterate our concurrence with Judge Murphy that there is no basis to conclude that the prosecution knowingly presented false or perjured testimony in this case.

In sum, we find no basis for the defendant's due process argument in the cases cited and we find no violation of the defendant's due process rights either in the trial court's decision not to hold an evidentiary hearing or in not granting the motion for new trial on the basis of newly discovered evidence.

*Affirmed.*

BRODERICK, J., sat for oral argument but did not take part in the final vote; BROCK, C.J., concurred; HORTON, J., retired, specially assigned under RSA 490:3, concurred.