# United States Court of Appeals

## For the First Circuit

No. 05-2587

SETH BADER,

Petitioner, Appellant,

v.

WARDEN, NEW HAMPSHIRE STATE PRISON,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph A. DiClerico, U.S. District Judge]

Before

Boudin, Chief Judge,

Cyr and Stahl, Senior Circuit Judges.

B. Michael Cormier for petitioner.
N. William Delker, Senior Assistant Attorney General, Criminal Justice Bureau, with whom Kelly A. Ayotte, Attorney General, was on brief for respondent.

May 25, 2007

**BOUDIN**, <u>Chief Judge</u>.  Vicki Bader--ex-wife of appellant Seth Bader--was murdered on August 24, 1996, seemingly in Stratham, New Hampshire, and her body was found in a grave in Waterboro, Maine, on April 10, 1997.  Police were led to the body by 14-year-old Joseph Bader, who was Seth's adopted son and biological cousin.  In December 1997, Joseph agreed with the state to enter a plea of "true" to a juvenile delinquency petition, confessing that he assisted in helping Seth murder Vicki.

At Seth's trial in April and May 1998 in New Hampshire state court, Joseph testified against Seth for four trial days. The gist of the testimony was that Seth and his girlfriend Mary Jean Martin had plotted to murder Vicki; that Seth had hired Sandro Stuto to assist in the murder and to dispose of Vicki's car; that Seth had traveled to Maine with Joseph a few days before the murder, located a spot in the woods and dug a grave; and that Joseph had kept Seth's younger son outside the house while the murder was committed.

Joseph did not claim to have witnessed the murder, but, according to his testimony, he had been called back into the house by Stuto after the murder and witnessed his adoptive father emerging from the basement with a rifle barrel and a spent casing; Joseph had then helped clean up the blood.  Joseph also testified that Seth had told him earlier that he (Seth) would shoot Vicki. Joseph further testified that he had then helped Seth transport and

-2-

bury Vicki's body in Maine and that on the way home he and Seth had gone shopping for new clothes.

The prosecution offered records of Seth's mobile phone to show calls from Maine on the date of Vicki's death. Credit card records showed Seth's card had been used that day to purchase pants in two different sizes, one pair of shoes and other items. Seth did not testify at his trial but the prosecution played a recording of a police interview for the jury in which Seth, while denying guilt, conceded that he might have driven with Joseph to Maine that day because of the good weather.

Stuto testified that on the day of the murder, he, Martin and Seth met together in the afternoon and agreed that Stuto would dispose of Vicki's car after the murder, leaving it at a bookstore. Seth and Stuto drove to the bookstore and then proceeded to Seth's house where, according to Stuto, Seth shot Vicki.[1] At trial the defense sought to call Martin, who refused to testify.

Although the state primarily relied on the testimony of Joseph and Stuto, other evidence in addition to the mobile phone and credit card records was offered. Vicki's lawyer testified as to Seth's aggressive efforts to reduce his financial obligations to

---

[1]While in prison Stuto apparently recanted, saying that Joseph had murdered Vicki in exchange for sexual favors from Martin and that Seth had nothing to do with the murder. The district court decided that Bader's habeas claim based on this recantation had no merit, and this issue is not before us.

Vicki and to secure custody of their children. In tape recordings of phone calls with Vicki, Seth expressed his obsession with holding onto and pleasing Martin and stated that Martin had said she would leave Seth unless he won the alimony and custody litigation.

A woman who regularly cleaned Seth's house testified to prior statements that Seth and his girlfriend wished Vicki were dead. Vicki's doctor said that Vicki had told him that she remained overweight so that her body would be difficult to move if she were killed. The prosecution also sought to connect Seth with a pipe bomb planted in Vicki's mailbox; one witness testified to Seth having a bomb-making book in his home.

The defense sought to discredit both Joseph and Stuto, emphasizing that Stuto had reached a deal for only five years in prison and that Joseph would do no time in prison. It offered evidence of Martin's deceptive character, her links to Joseph, and Joseph's hostility towards Vicki. It also attempted to raise doubts about the state's theory.[2] In closing, the defense offered an alternative theory that, without Seth's involvement, Martin had

---

[2]For example, the defense argued that Joseph's testimony about the time of the murder could not be true because Joseph's testimony that Seth and Stuto arrived at the Stratham, New Hampshire, house around 3 p.m. seemed to conflict with the fact that Seth had been cited for a traffic violation around 2:30 p.m. in Massachusetts. The defense also noted that Joseph testified to several items that should have been found buried with the body, but were not.

convinced Joseph to do the killing and that both Joseph and Martin stood to benefit from killing Vicki and framing Seth.

The jury convicted Seth of first-degree murder and conspiracy to murder, and he was sentenced to life imprisonment on the murder charge. The New Hampshire Supreme Court affirmed his conviction. State v. Bader, 808 A.2d 12 (N.H. 2002). After Seth's trial, juvenile court hearings were held to track Joseph's progress; but Joseph never spent any time in a correctional facility.

In October 2002, Seth filed the present habeas case in federal district court. He claimed, inter alia, that in violation of Brady v. Maryland, 373 U.S. 83 (1963), the prosecution had made but did not disclose to the defense a leniency-for-testimony deal for Joseph's testimony, which could have been used to impeach Joseph at trial. Giglio v. United States, 405 U.S. 150, 154-55 (1972). Seth now conjectures that the agreement might have been kept secret from Joseph himself.

The issue whether any agreement existed had been elaborately explored in the state proceedings. In September 1997, prior to Seth's trial, the defense filed a motion for discovery of "all details of all agreements and understandings with" Joseph or other co-defendants. When in December 1997 Joseph agreed to plead guilty in the juvenile proceedings, the state got court permission

and then disclosed to Seth's lawyers Joseph's juvenile court records.

On March 26, 1998, after Seth's trial had begun, he filed a second motion for discovery, this time asking for all records relating to communication between the Attorney General's office and Joseph's attorneys and documents relating to charging decisions made by the Attorney General's office. Defense counsel also made oral motions at trial. In response, the judge ordered that "all documents in the file(s) relating to the juvenile filed in the Family Court," including notes from therapists, be provided to the court.

The trial judge then reviewed in camera the documents that the state had provided. After this review, on April 9, 1998, the state judge determined that the record did not contain any material "which is exculpatory, essential to the defendant receiving a fair trial, or which relate[s] to any understandings or agreements relative to plea decisions or other information which can be construed as Giglio materials."

The prosecutor reaffirmed on April 10, 1998, that the state had disclosed all agreements with Joseph and his attorneys. The judge nevertheless ordered expedited access to the transcript of Joseph's plea hearing, which had occurred in December 1997. Although defense counsel inferred from tapes of that hearing that

a leniency-for-testimony agreement existed,[3] the trial judge listened himself and ruled that there was no evidence of a deal requiring Joseph to testify at Seth's trial.

At Seth's trial, the judge let Seth's trial counsel cross-examine Joseph about any such deal. Joseph admitted that his plea agreement meant that he would not be incarcerated even for "one second," that the disposition hearing in his case would not occur until after Seth's trial, and that the juvenile court would know of his testimony in Seth's trial. But Joseph said that he had not made any agreement to testify.[4]

Nevertheless, on his state appeal, Seth argued to the New Hampshire Supreme Court that Joseph's plea agreement was contingent on his testifying against Seth and that the trial court had erred in finding to the contrary. In rejecting the appeal, the court said:

> There is no evidence in the extensive record in this case to support a conclusion that the trial court erred either in its finding following the <u>in camera</u> review or in its

---

[3]Defense counsel noted that at the juvenile plea hearing a state attorney stated that "Joseph will be testifying" in Seth's trial. But this was not listed as a term of the plea agreement, but rather as part of a time line relating to Joseph. When the juvenile court judge explained the agreement to Joseph, he made no mention of testifying.

[4]Shown a transcript of the plea agreement, he backtracked somewhat; but in fact, the transcript confirms that the prosecutor told the juvenile court only that Joseph was <u>expected</u> to testify against Seth--not that this was a term of the plea agreement or in exchange for leniency.

> finding of no evidence of a "sine qua non"
> [sic] on the part of the State in return for
> Joseph Bader's testimony. . . . Accordingly
> the defendant cannot prevail in his effort to
> secure a new trial on this issue as he has
> failed to "prove that the prosecution withheld
> evidence that is favorable and material."

Bader, 808 A.2d at 22-23 (citations omitted).

In federal habeas proceedings directed to state prisoners, the federal statute provides that findings by the state court are conclusive unless overcome by clear and convincing evidence. 28 U.S.C. § 2254(e)(1) (2000). The district court initially dismissed Seth's Brady claim as one previously litigated and resolved, adding that Joseph could not have been influenced in his testimony if a deal had existed but been kept secret from him.

Seth then discovered that a social worker had kept notes of a November 26, 1997, meeting attended by Joseph's public defenders, his social workers and a state prosecutor. Shortly after the district court dismissed Seth's habeas petition, Seth sought reconsideration, accompanying the motion with affidavits from one of his own trial lawyers saying that he had not known of the November 26, 1997, meeting. The notes kept by one of the social workers attending the meeting said

> Joe will be charged with conspiracy to commit
> murder. It would be appropriate to do
> accomplice but that would mean being certified
> as an adult and life in prison . . . Want a
> plea of true [guilty] at the Dec. 8 arranmnet
> [sic]. Do NOT want to do the dispositional
> [sentencing] before the [petitioner's]
> criminal trial. . . . Attys. for Joe

-8-

> advocating strongly for a change to a minor
> charge . . . .

The district court reopened the habeas proceeding, and Seth filed a proposed discovery plan seeking to depose the three social workers who had attended the meeting and also various lawyers, including the prosecutors. The district court found the plan overbroad because it covered unrelated issues but approved a second plan by Seth's counsel to depose the social workers.[5]

The depositions occurred, and the social workers recalled that the prosecutor had said that he wanted Joseph to plead guilty before Seth's trial and be sentenced afterwards and that they understood that Joseph was expected to testify at Seth's trial. However, they also recalled no agreements--either for leniency in exchange for testimony or for anything else--being made at the November 26, 1997, meeting.

Seth's counsel then sought to depose the lawyers who had attended the meeting, including the prosecutor, but the district court refused, saying that there was no good cause for further discovery. The judge repeated that if there had been a deal between prosecutor and defense counsel but this was unknown to Joseph--as Seth now suggested--it could not have affected his

---

[5]In Bader's revised discovery motion, he stated that "the three social workers can claim no privilege of any sort, are not committed to any prior statements, and presumably are unfamiliar with any legal theories of this case. They are the most likely of the meeting's participants to offer unvarnished recollections."

testimony and so could not undermine the court's confidence in the verdict.

The district court granted a certificate of appealability limited to the supposed agreement. Seth argues to us (under several headings) the same central claim: that the district court erred in granting summary judgment against him because there remained a genuine issue of fact requiring resolution in an evidentiary hearing, namely, whether the prosecutors concealed a leniency-for-testimony deal with Joseph or at least with his lawyers. Seth relies in particular on Townsend v. Sain, 372 U.S. 293 (1963).

Townsend, 372 U.S. at 313, laid out a broad right of de novo federal fact-finding for state prisoners. But it was significantly qualified by later case law and congressional action leaving the circuit courts in some uncertainty.[6] In all events, just this month the Supreme Court, glossing Townsend itself, has made clear that the "decision to grant an evidentiary hearing [is] generally left to the sound discretion of district courts." Schriro v. Landrigan, No. 05-1575, 2007 WL 1387923, at *5-*6 (U.S. May 14, 2007).

---

[6]See Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992); Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 104(4)(e), 110 Stat. 1214. Compare Campbell v. Vaughn, 209 F.3d 280, 287 (3d Cir. 2000), cert. denied, 531 U.S. 1084 (2001), with Conaway v. Polk, 453 F.3d 567, 582 (4th Cir. 2006).

-10-

In all events, Seth has no clear and convincing evidence of an actual agreement, made between the prosecutors and defense counsel, by which Joseph would testify in exchange for leniency. Absent evidence that, if accepted, could overcome the powerful presumption in favor of the state-court finding, there is nothing to be tried in an evidentiary hearing. Thus, the real issue is not the right to an evidentiary hearing but whether Seth is entitled to more discovery than he got. See Blackledge v. Allison, 431 U.S. 63, 81 (1977).

In civil matters including habeas, evidentiary proceedings are appropriate only where the party bearing the burden of proof on an element starts with enough evidence to create a genuine issue of fact; otherwise summary judgment is proper. Anderson v. Attorney Gen. of Kan., 425 F.3d 853, 860 (10th Cir. 2005). Seth recognizes the distinction, arguing in his brief that the question is not whether he now has enough evidence but whether he should be entitled to depose more witnesses in order to get it.

Rule 6 of the Rules Governing Section 2254 Cases provides that in habeas proceedings "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery." Bracy v. Gramley, 520 U.S. 899, 904 (1997), stated that "[a] habeas petitioner, unlike the usual civil litigant in federal court, is

not entitled to discovery as a matter of ordinary course." Quoting

Harris v. Nelson, 394 U.S. 286, 300 (1969), the Court explained:

> [W]here specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry.

Bracy, 520 U.S. at 908-09.

However, Bracy also said that "the scope and extent of such discovery is a matter confided to the discretion of the District Court." Id. at 909. Since the 1996 statutory changes, circuit courts have continued to apply Bracy. E.g., Newton v. Kemna, 354 F.3d 776, 783 (8th Cir.), cert. denied, 543 U.S. 979 (2004) (denial of discovery reviewed "for an abuse of discretion"); Pham v. Terhune, 400 F.3d 740, 741 (9th Cir. 2005) (same).

In this case the context for the district judge's decision on discovery is that the state court had found there was no evidence of an agreement. What Seth's habeas counsel recently found was evidence of a specific meeting between Joseph's lawyers and the prosecutors. But all this shows is an occasion on which a leniency-for-testimony agreement might have been made or disclosed. And, when the three social workers were deposed, they said there was no agreement made or disclosed at the meeting. This was hardly clear and convincing evidence that the state finding had been wrong.

Just as the district judge had latitude to allow initial discovery as to the previously unknown meeting, he also had latitude to call a halt when three disinterested witnesses said that no such agreement had been made. As Seth stated in his discovery plan: "The prosecutor is unlikely to change his story unless confronted with detailed accounts of the meeting by other participants." The detailed accounts turned out to support the prosecutors' prior consistent denials.

Seth also attacks the district judge's alternative ground for bringing matters to a close, namely, that Joseph could not have been influenced in his testimony by a deal of which he was unaware. This inference may go too far: a promise <u>to Joseph</u> of leniency in exchange for testimony would be the best basis for discrediting Joseph. But, even if Joseph were unaware of a commitment only to his lawyers, they might have encouraged him to help the government.

Yet this qualification is dwarfed by the reality that regardless of any "agreement," secret or otherwise, Joseph already had ample reason to tailor his testimony to please the prosecutor: his plea was before Seth's trial, disposition came afterwards, and Joseph had reason to please prosecutors who might have a persuasive voice as to his sentence. <u>But all this was known at the time of Seth's trial</u> and Joseph was subject to full cross-examination as to the details of his testimony and his own motives in helping the prosecution. See <u>Kyles</u> v. <u>Whitley</u>, 514 U.S. 419, 435 (1995)

-13-

(noting that the government's non-disclosure of evidence must have had a "substantial and injurious effect or influence in determining the jury's verdict").

Faced with conflicting stories, the jury chose to believe Joseph. Whether a secret leniency agreement, unknown to Joseph, would have added much to available impeachment, may be open to doubt. But in any event, the district judge did not abuse his discretion in limiting discovery.

<u>Affirmed.</u>