Bader v. Warden, NHSP          CV-02-508-JD  05/28/03
                UNITED STATES DISTRICT COURT FOR THE
                     DISTRICT OF NEW HAMPSHIRE


Seth Bader

     v.                              Civil No. 02-508-JD
                                     Opinion No. 2003 DNH 090
Warden, New Hampshire
State Prison


                           O R D E R


     The plaintiff, Seth Bader, seeks habeas corpus relief,

pursuant to 28 U.S.C. § 2254, from his conviction on charges of

conspiracy to commit murder and first degree murder in the death

of his former wife and from his sentence to a life term without

the possibility of parole.  He makes five claims in support of

his habeas petition and moves for summary judgment as to three of

the claims.  The Warden moves for summary judgment as to all five

claims.  Bader moves to hold his fifth claim in abeyance pending

discovery.

                          Background

     Seth Bader did not include a factual statement in support of

his motion for summary judgment or in opposition to the Warden's

motion.[1]  See LR 7.2(b).  Instead, Bader submitted his own

_____

     [1]Bader is represented by counsel, and before his conviction,
he was a member of the bar in this state.

affidavit in support of his objection to the Warden's motion for summary judgment to dispute certain facts included in the Warden's factual statement. The following background is taken from the parties' properly supported factual information and from State v. Bader, 808 A.2d 12 (N.H. 2002).

Seth Bader and Vicki Bader were married in 1991 and divorced in 1994. They had two adopted children, Joseph and Matt, and one biological child, Sam. Joseph Bader, who was born in 1982, is Seth Bader's biological cousin as well as his adopted son. The Baders' divorce and custody proceedings were not amicable. Issues pertaining to the financial settlement and custody of the children were in litigation when Vicki Bader was killed.

After the divorce, Seth Bader had a relationship with Mary Jean Martin, who became his fiancée. Both Bader and Martin told others that they wanted Vicki dead. Sandro Stuto testified that Martin hired him and others to terrorize Vicki by shooting the windows in her house with a BB gun, slashing her tires and threatening her, and planting a pipe bomb in her mailbox. Martin negotiated with Stuto to kill Vicki but refused to pay the price Stuto demanded. Martin then hired Stuto to dispose of Vicki's car after she was murdered.

Joseph Bader was twelve years old at the time of the divorce and fourteen years old when Vicki was murdered. He lived with

2

Seth Bader, along with his brothers Matt and Sam. Joseph testified that Seth dictated hateful notes for Joseph to send to Vicki as part of his effort to resolve the custody and support payment dispute in his favor. Joseph also broke into Vicki's house and killed her pet parakeets at Seth's direction.

Joseph testified that Seth planned to murder Vicki by shooting her. In preparation for the murder, Joseph and Seth drove to a secluded wooded area in Waterboro, Maine, and dug a hole to use as a grave. Seth told Joseph that he was to make sure that Vicki went into the house, take care of Sam while the shooting occurred, and then help bury Vicki's body in Maine. Seth showed Joseph the guns that would be used in the shooting--a "Thompson Contender," with a removable barrel, that Seth would use, and a shotgun for Stuto. The guns were stored in the basement of Seth's house. Seth told Joseph that he would use the Thompson Contender to kill Vicki because he could change the barrel. Seth planned to have Stuto as a backup in case Seth missed when he tried to shoot Vicki.

Vicki came to Seth's house on August 24, 1996, to drop off their son, Sam, after her visitation with him. Martin had taken the Baders' other son, Matt, shopping. Joseph testified that, as directed by Seth, he met Vicki outside and took Sam, telling Vicki that Seth wanted to see her inside the house. Inside the

3

house, Stuto waited with a shot gun in the study, watching her arrive from the window. Seth waited in the kitchen area, also armed with a gun.

After Stuto heard Seth's gun discharge, he called Joseph to come in with Sam. Joseph took Sam upstairs and locked him in the bedroom with a child gate. When Joseph came back downstairs, he found Vicki lying on the floor in the kitchen, bleeding from her head and appearing to be dead. Both Seth and Stuto had guns. Seth directed Joseph and Stuto to clean up and to put a garbage bag over Vicki's head to keep the blood contained while he took the guns to the basement. Seth returned with the barrel from his gun and the spent casing from the shot fired. Seth, Stuto, and Joseph carried Vicki's body to Seth's Jeep and put the body in the back, covered by the cargo screen.

Martin returned with Matt, but soon left, taking Matt and Sam. Stuto drove away in Vicki's car and left it, as planned, in a "bad area" with the keys and the windows open, so that it would appear to have been stolen.

Seth and Joseph left in the Jeep to bury the body. Joseph buried the body in the pre-dug grave in Waterboro, Maine, while Seth buried the gun barrel and spent casing. Seth's cellular telephone records indicate calls on the evening of August 24, 1996, from the calling area that includes Waterboro, Maine. On

4

the return trip, they stopped at a mall to buy new clothes.

On April 10, 1997, Joseph led the police to the site where Vicki Bader was buried. Using a metal detector and directions from Joseph, the police also found a gun barrel and live ammunition buried in the area. They did not find a spent casing. The ammunition and gun barrel fit Seth's Thompson Contender gun.

The state filed a juvenile delinquency petition against Joseph in November of 1997, based on his participation in the conspiracy to murder Vicki Bader. In December of 1997, the state and Joseph entered a plea agreement as to the juvenile petition.

Seth Bader was arrested in April of 1997 and charged with murder and conspiracy to commit murder in the death of Vicki Bader. The administrator of Vicki's estate brought a wrongful death claim against Bader in New Hampshire state court. The administrator sought and Judge Murphy granted an ex parte attachment on Bader's assets and an injunction to keep him from spending the assets. The attachment was later modified by agreement of the parties.

Judge Murphy was also assigned to the criminal case against Bader and set bail at $750,000. Bader contends that he could not make bail because of the attachment on his assets. Bader petitioned the New Hampshire Supreme Court for a writ of habeas corpus, challenging the bail order. The petition was denied. In

5

October of 1997, Bader's new counsel in the civil case moved for summary judgment and to vacate the attachment. Judge Murphy recused himself from the civil case in November of 1997 "'in light of the allegations contained in [the] defendant's pleadings.'" Bader, 808 A.2d at 19 (quoting Judge Murphy). In a later clarification, Judge Murphy indicated that he had recused himself "'because of a writ of habeas corpus that was filed on [the defendant's] behalf, which I thought contained all kinds of misstatements.'" Id. Judge Murphy continued to preside in the criminal proceeding against Bader.

The criminal trial was held from March 24, 1998, to May 8, 1998. The jury found Bader guilty on both counts. Joseph Bader and Sandro Stuto, along with others, testified for the state. Mary Jean Martin was called by the defense but invoked her Fifth Amendment privilege not to testify. Bader was sentenced on May 8, 1998, to life without the possibility of parole, for first degree murder, and to a concurrent sentence of seven and one half to fifteen years, for conspiracy.

A notice of appeal was filed on Bader's behalf with the New Hampshire Supreme Court. The court accepted the appeal. Bader then filed a motion for a new trial in superior court, raising five issues, including whether Judge Murphy should have recused himself from the criminal case. The supreme court remanded the

6

case for consideration of Bader's motion for a new trial. One hearing was held on the recusal issue and another hearing was held on the remaining four issues. Judge Murphy denied the motion for a new trial on all five grounds.

The New Hampshire Supreme Court permitted Bader to amend his notice of appeal to include the five issues raised in the motion for a new trial. These were the only issues Bader briefed for purposes of the appeal. The New Hampshire Supreme Court in a thorough and considered opinion affirmed Bader's conviction. Bader, 808 A.2d at 33. Bader then filed a petition in this court seeking habeas corpus relief, based on the same five issues raised in his appeal.

## Standard of Review

Summary judgment is appropriate in habeas proceedings, as in other civil actions, when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Fed. R. Civ. P. 81(a)(2); Rule 11 of the Rules Governing § 2254 Cases. Additional standards apply to the court's review of summary judgment motions in habeas cases. See, e.g., Smith v. Cockrell,

7

311 F.3d 661, 668 (5th Cir. 2002). If the state court adjudicated the petitioner's federal claims on the merits, the federal court, considering the same claims on habeas review, must decide whether the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law," or "resulted in a decision based on an unreasonable determination of the facts . . . ." § 2254(d). On the other hand, if the state court did not address properly preserved federal claims on the merits, the federal court reviews the decision under a de novo standard. Gruning v. Dipaolo, 311 F.3d 69, 71 (1st Cir. 2002). "Furthermore, . . . state-court determinations of factual issues 'shall be presumed to be correct,' unless the petitioner rebuts the presumption 'by clear and convincing evidence.'" Niland v. Hall, 280 F.3d 6, 11 (1st Cir. 2002) (quoting § 2254(e)(1)).

## Discussion

Bader contends that he is entitled to habeas relief on the grounds that: (1) Judge Murphy was biased, or appeared to be biased, in violation of due process, (2) exculpatory information was withheld from the defense in violation of due process, (3) a trial witness was allowed to testify to out-of-court statements made by Vicki Bader in violation of the Confrontation Clause, (4)

8

jurors were subject to improper influence in violation of the Sixth Amendment, and (5) the state tolerated perjury by one of its witnesses in violation of due process. Bader moves for summary judgment on the first, third, and fourth claims. The Warden moves for summary judgment on all five claims. Bader objects to the Warden's motion and moves to delay consideration of summary judgment as to the fifth claim pending discovery.

A. <u>Judicial Impartiality</u>

Bader contends that because Judge Murphy recused himself from the civil suit involving Bader, based on the judge's perception of misstatements in Bader's petition for a writ of habeas corpus in the criminal action, he was also obligated to recuse himself in the criminal action. Bader asserts that Judge Murphy was biased or appeared to be biased against him, based on his decision to recuse in the civil case. Because the New Hampshire Supreme Court did not analyze the judicial bias claim under federal law, <u>see</u> <u>Bader</u>, 808 A.2d at 19, the court considers the legal basis of Bader's claim de novo, while the supreme court's pertinent factual findings are accepted as true.[2]

Due process requires that a criminal defendant be tried

---

[2]Bader does not challenge the factual basis of the supreme court's ruling. <u>See</u> § 2254(e).

9

before an impartial judge. See Bracy v. Gramley, 520 U.S. 899, 904-05 (1997); In re Murchison, 349 U.S. 133, 136 (1955). To show a due process violation due to a lack of impartiality, the claimant must prove either that the judge was actually biased against him or that the appearance of bias was sufficient to establish a conclusive presumption of bias. See, e.g., Taylor v. Hayes, 418 U.S. 488, 501 (1974); Tumey v. Ohio, 273 U.S. 510, 532 (1927); Fero v. Kerby, 39 F.3d 1462, 1478 (10th Cir. 1994). Proof of bias must "reveal an opinion that derives from an extrajudicial source" or "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." Liteky v. United States, 510 U.S. 540, 555 (1994).

Bader relies on In re Murchison, 349 U.S. 133 (1955). Murchison involved a procedure under the law of Michigan which authorized state judges to act as a "one-man judge-grand jury." Murchison, 349 U.S. at 133. Using that procedure, a judge called two witnesses to appear before him in secret proceedings to investigate suspected gambling operations and bribery of policemen in Detroit. Id. at 134. In the course of the judge's interrogation of Murchison, a Detroit policeman, the judge decided that Murchison had committed perjury, based on other evidence known to the judge. Id. The judge charged Murchison with perjury and ordered him to show cause why he should not be

held in contempt. Id. The other witness, White, refused to answer, and the judge also charged him with contempt. Id. at 135. The same judge then tried and convicted both Murchison and White on the contempt charges. White and Murchison appealed the decision through the state court system and to the United States Supreme Court.

The Supreme Court noted, that "[i]t would be very strange if our system of law permitted a judge to act as a grand jury and then try the very persons accused as a result of his investigations." Id. at 137. The Supreme Court concluded that the judge was necessarily influenced by his personal knowledge of the evidence from his secret grand jury session which prevented him from being impartial as to the evidence presented in his judicial role. Id. at 138. Therefore, it was a violation of due process for the judge to sit as both a grand jury and trial judge in that case. Id. at 139.

The circumstances of Murchison did not occur in this case. Judge Murphy's decision to recuse himself from the civil case was based on a filing made on Bader's behalf in a public proceeding.[3]

_____

[3]Bader has not provided a copy of the state habeas petition in question. Bader characterizes the statements at issue as arguing that Judge Murphy had handled the civil and criminal actions in such a way as to make them "sham proceedings with a superficial veneer of due process." Brief in Support of Petition for Writ of Habeas Corpus at 31-32.

No issue exists in this case concerning any extra-judicial knowledge which the judge may have had about the case and any potential influence it may have had on his ability to be impartial as the trial judge.[4] Therefore, <u>Murchison</u> is inapposite to the facts presented here. Although sufficiently serious personal attacks on a judge during trial may preclude him on due process grounds from presiding at the resulting contempt proceeding, <u>see, e.g.</u>, <u>Taylor v. Hayes</u>, 418 U.S. 488, 501 (1974); <u>Mayberry v. Pennsylvania</u>, 400 U.S. 455, 464 (1971), a party or his counsel's misbehavior alone will not drive a judge out of the trial itself. <u>See</u> <u>United States v. Pina</u>, 844 F.2d 1, 14 (1st Cir. 1988) (discussing <u>Taylor</u> and <u>Mayberry</u>).

"'Opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.'" <u>Bader</u>, 808 A.2d at 21 (quoting <u>Liteky</u>, 510 U.S. at

---

[4]Before the New Hampshire Supreme Court, Bader argued that Judge Murphy's decision on the ex parte attachment in the civil action was, in essence, a predetermination of the charges against him in the criminal action. The supreme court found that Bader "failed to show any evidence of Judge Murphy having acquired the 'mindset' to which the defendant refers." <u>Bader</u>, 808 A.2d at 20. Bader does not appear to press that argument here.

12

555).  The New Hampshire Supreme Court found that Bader had not shown that Judge Murphy reacted to the alleged misstatements in the habeas petition with hostility toward Bader.  The court, after reviewing the record, "found no evidence that Judge Murphy had, in any way, become embroiled in mutual criticism with the defendant."  Id.

Bader does not contest the court's factual findings and provides no factual basis here to show that the circumstances "so embroil[ed] [Judge Murphy] in controversy that he [could not] 'hold the balance nice, clear, and true between the State and the accused . . . .'"  Taylor, 418 U.S. at 501 (quoting Tumey v. Ohio, 273 U.S. 510, 532 (1927)).  Therefore, Bader has not shown a due process violation based on judicial bias.  The Warden is entitled to summary judgment on the judicial bias claim.


B.  Exculpatory Evidence

Bader's claim based on exculpatory evidence involves Joseph Bader's plea agreement with the state and Joseph's therapy records.  Bader contends that in addition to the written plea agreement between Joseph and the state, which was disclosed to the defense, there was a secret oral understanding or de facto agreement between the state and Joseph, or his counsel, that conditioned the extent of the state's leniency on the nature of

13

Joseph's testimony at Bader's trial.  Bader also contends that the state court violated due process by not revealing Joseph's confidential therapy information.  The New Hampshire Supreme Court decided the exculpatory evidence issue under state law, so that this court's review is de novo.

The Constitution requires as part of a fair trial that the prosecution disclose material exculpatory and impeachment evidence to the defense.  See, e.g., United States v. Ruiz, 536 U.S. 622, 628 (2002); Kyles v. Whitley, 514 U.S. 419, 435 (1995); Pennsylvania v. Ritchie, 480 U.S. 39, 57 (1987); Giglio v. United States, 405 U.S. 150, 154 (1972); Brady v. Maryland, 373 U.S. 83, 87 (1963).  Such evidence is often referred to as "Brady material."  Strickler v. Greene, 527 U.S. 263, 281 (1999).  A Brady violation has three components:  "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  Id. at 281-82.  Undisclosed favorable evidence is material or prejudicial if there is a "'reasonable probability' of a different result" in that the lack of the evidence at trial "'undermines confidence in the outcome of the trial.'"  Kyles, 514 U.S. at 434 (quoting Bagley, 473 U.S. at 678).

14

1.  Evidence of an undisclosed agreement.

Information about a state witness's plea agreement or an agreement for leniency in exchange for testimony is Brady material.  See Giglio, 405 U.S. at 153-55.  Bader asserts that the prosecution willfully withheld information about a secret deal with Joseph Bader that the degree of the state's leniency would depend on the degree of the prosecution's satisfaction with his testimony against Bader at trial.  The state trial court held hearings on the issue of Joseph's plea agreement with the state and concluded that there was no evidence of a "sine qua non" deal based on the nature of his trial testimony.  The New Hampshire Supreme Court affirmed, holding:  "There is no evidence in the extensive record in this case to support a conclusion that the trial court erred . . . in its finding of no evidence of a 'sine qua non' on the part of the State in return for Joseph Bader's testimony."  Bader, 808 A.2d at 23.

The written plea agreement was disclosed to the defense.  Joseph testified at trial that he did not believe he was required to testify as part of his plea.  Bader speculates that Joseph's counsel and the prosecutors may have had an agreement among themselves, unknown to Joseph, and seeks discovery from the prosecutors and Joseph's counsel.  There is no evidence to support Bader's speculation.  Even if there were such an

15

agreement between his counsel and counsel for the state, as long as Joseph was unaware of any "sine qua non" while he was testifying, any such agreement unknown to him could not have affected his testimony. Therefore, even if it existed, it would be immaterial.

Bader now offers, in support of his objection to the Warden's motion for summary judgment, what he claims is new evidence of a secret agreement between prosecutors and Joseph's counsel that was not disclosed in the course of the criminal proceeding. The purported new evidence is a copy of a Division of Children, Youth and Families ("DCYF") "Contact Log" for November 26, 1997. Bader represents that he obtained the copy of the "Contact Log" excerpt through discovery in another proceeding in state court, family division, In the Matter of Samuel Robert Bader, 2001-T-0015, March 3, 2003. The entry is dated November 26, 1997, and indicates a "face to face" meeting with Joseph's counsel, James Bofetti and Hillary Farber, the prosecutor, John Kacavas (spelled "Cacadis"), DCYF attorney Everard Hatch (referred to as "Ev"), and DCYF staff.

The "Summary" of the meeting pertains to the charges against Joseph and the disposition of the charges. According to the "Summary," the prosecutors wanted to help Joseph "recapture his humanity." To that end, they planned to proceed in juvenile

16

court on a charge of conspiracy to commit murder, rather than accomplice to murder, in order to avoid having Joseph certified as an adult. The prosecutors wanted Joseph to plead "true" at his arraignment but wanted the dispositional hearing to be held after he testified at Bader's trial. They agreed that the Juvenile Service Officer would use the psychiatrist's report as the pre-disposition investigation.

Bader's current counsel represents, as part of the objection to the Warden's motion for summary judgment, that the DCYF "Contact Log" was not disclosed to defense counsel at Bader's criminal trial. Since Bader's current counsel did not participate in the defense at trial or on appeal and has not supported his representation with his own affidavit or an affidavit of Bader's trial counsel, that statement cannot be accepted for purposes of summary judgment. See Lopez v. Corporacion Azucarera de Puerto Rico, 938 F.2d 1510, 1516 (1st Cir. 1991). In addition, it appears that the same information was made available to defense counsel through a tape recording of a juvenile proceeding involving Joseph. See Tr. 8:1-17. The Brady rule applies only to information that was unknown to the defense at the time of trial. United States v. Agurs, 427 U.S. 97, 103 (1976). Therefore, Bader has not shown that the "Contact Log" excerpt was material evidence subject to the Brady rule.

17

The trial court, affirmed by the supreme court, found no evidence of an undisclosed "sine qua non" agreement. Bader has not provided clear and convincing evidence to the contrary, as would be necessary to rebut the presumed correctness of that finding. See § 2254(e)(2). Therefore, Bader has not demonstrated any basis for further factual development of the issue or that the state failed to disclose Brady material concerning a "sine qua non" agreement.

2. Undisclosed psychiatric records.

Bader challenges the trial court's in camera review of Joseph Bader's confidential psychiatric records. In particular, Bader asserts that Joseph may have made statements to his therapists that are inconsistent with his trial testimony and that recant his testimony against Bader. Bader contends these statements should have been disclosed to the defense.[5] He also contends that defense counsel should have been allowed to review the confidential records. Bader cites another newly discovered

_____

[5]Well before the criminal trial, Bader's counsel received a memorandum summarizing the psychologist's evaluation of Joseph as related to his DCYF social worker. Bader's trial counsel then sought additional discovery as to the information that formed the basis of the psychologist's evaluation. That request lead to the trial court's in camera review of the confidential and privileged information.

18

DCYF "Contact Log" message in support of his theory.

There is no Supreme Court precedent that supports Bader's assertion of a right to have his counsel review a state witness's confidential psychiatric records or to be present during the court's review.[6]  Instead, the Supreme Court has ruled that such information is to be reviewed, in camera, by the court to determine if the information is material to the defense. Ritchie, 480 U.S. at 58.  That is what happened in this case.

Privileged or confidential information must be disclosed if the court, through in camera review, "determines that the information is 'material' to the defense of the accused." Ritchie, 480 U.S. at 58.  After reviewing Joseph's therapists' notes and other privileged information, the trial court found that the materials contained "no information which is exculpatory, essential to the defendant receiving a fair trial, or which relate [sic] to any understandings or agreements relative to plea decisions or other information which can be construed as Giglio materials."  State v. Bader, 97-S-1039, April 9, 1998.  The supreme court concluded that "no evidence in the extensive record in this case [supports] a conclusion that the trial court erred [] in its finding following the in camera

_____

[6]To the extent this issue is new and unexhausted, as asserted by the Warden, the court may deny the claim on the merits, even if it is unexhausted.  § 2254(b)(2).

review." <u>Bader</u>, 808 A.2d at 23.

The DCYF message, provided here, does not undermine the state courts' findings. Nor has Bader provided clear and convincing evidence to rebut the presumption of correctness as to the state courts' findings. Therefore, the Warden is entitled to summary judgment on the claim that <u>Brady</u> material was withheld from the defense.

C. <u>Hearsay Evidence</u>

Vicki Bader's physician, Dr. James Fieseher, testified that Vicki began to gain weight in 1993 and that by August of 1996, at the time of her death, she was obese. Dr. Fieseher also testified that in the course of a physical examination in July of 1995, Vicki told Dr. Fieseher that the reason she had gained weight was to "make her body more difficult to move once she was killed." <u>Bader</u>, 808 A.2d at 23. He stated that Vicki "thought the defendant was going to kill her and she envisioned him trying to move her body." <u>Id.</u> In response to defense counsel's objections, the trial court instructed the jury to disregard the reference to the defendant but otherwise allowed the testimony. The statements were allowed under New Hampshire Rule of Evidence 803(4). <u>Id.</u>

Bader contends that Dr. Fieseher's hearsay testimony

20

violated the Sixth Amendment Confrontation Clause. "In all criminal prosecutions, state as well as federal, the accused has a right, guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, 'to be confronted with the witnesses against him.'" Lilly v. Virginia, 527 U.S. 116, 123 (1999) (quoting Pointer v. Texas, 380 U.S. 400 (1965)). When the government offers hearsay evidence and the declarant is unavailable, the government must show that the evidence nevertheless bears sufficient indicia of reliability because either "(1) 'the evidence falls within a firmly rooted hearsay exception' or (2) it contains 'particularized guarantees of trustworthiness' such that adversarial testing would be expected to add little, if anything, to the statements' reliability." Id. at 124 (quoting Ohio v. Roberts, 448 U.S. 56, 66 (1980); accord Trigones v. Bissonnette, 296 F.3d 1, 6-7 (1st Cir. 2002). The exception for statements made for purposes of medical treatment or diagnosis is a "firmly rooted" exception to the hearsay rule. See White v. Illinois, 502 U.S. 346, 355 n.8 (1992).

Under New Hampshire Rule of Evidence 803(4), out-of-court statements are admissible, when the declarant is unavailable, if the declarant made the statements intending to obtain medical diagnosis or treatment, if the statements pertained to diagnosis and treatment, and if the circumstances indicated that the

statements were trustworthy.  Bader, 808 A.2d at 24-25.  The New Hampshire Supreme Court concluded that Dr. Fieseher's testimony met the criteria of Rule 803(4).  The supreme court then concluded, applying United States Supreme Court precedent, that "the statements were properly admitted under a firmly rooted hearsay exception, adequate indicia of reliability were present and their admission did not violate the defendant's rights under the Confrontation Clause of the Sixth Amendment."  Id. at 26.  Because the New Hampshire Supreme Court adjudicated Bader's federal claim, the deferential standard of § 2254(d) applies.

As the Warden contends, the New Hampshire Supreme Court identified the proper Supreme Court precedent.  In his objection to the Warden's motion for summary judgment, Bader does not contend that the holding is contrary to or an unreasonable application of Supreme Court precedent.  Instead, Bader relies on Olesen v. Class, 164 F.3d 1096 (8th Cir. 1999), and advocates an "Olesen rule" as to the medical necessity of the out of court statements.  Bader argues that under Olesen, Vicki's statements about the reasons for her weight gain and obesity were not necessary for her medical care.  Since Olesen is not a Supreme Court case, it is not pertinent to the § 2254(d) analysis.

In addition, as the New Hampshire Supreme Court carefully explained, Vicki's statements to Dr. Fieseher were part of a

physical examination that included concern about her weight and weight-related issues such as blood pressure. Her statements were part of her explanation for her weight gain. That Dr. Fieseher found Vicki's explanation bizarre does not obviate its intended purpose.

In his brief in support of his petition for a writ of habeas corpus, Bader argues that Dr. Fieseher's testimony identifying Bader as the person Vicki thought would kill her was inadmissible. As the Warden points out, the trial judge sustained defense counsel's objection to that part of the testimony and directed the jury to disregard that part of the testimony. Bader contends, however, that the prejudicial effect of the testimony cannot be cured by the judge's instruction.

Except in unusual circumstances, an appropriate cautionary instruction pertaining to improper evidence is deemed to cure any resulting prejudice. See Richardson v. Marsh, 481 U.S. 200, 206-07 (1987); Francis v. Franklin, 471 U.S. 307, 324 n.9 (1985); see also United States v. Lee, 317 F.3d 26, 34-5 (1st Cir. 2003). Dr. Fieseher's testimony identifying Bader as the person Vicki feared would kill her does not fall within any of the narrow exceptions to the presumed efficacy of cautionary instructions. See, e.g., Bruton v. United States, 391 U.S. 123, 136 (1968) (exception for co-defendant's confession); Jackson v. Denno, 378

U.S. 368, 387-88 (1964) (exception for coerced confession); Krulewitch v. United States, 336 U.S. 440, 453 (1949) (Jackson, J., concurring) (concluding that prejudicial evidence of conspiracy, admissible only if conspiracy existed, cannot be overcome by limiting instruction). Bader also cites Brookhart v. Janis, 384 U.S. 1 (1966), in which defense counsel waived the defendant's right to cross-examination. Brookhart is inapposite to this case. Therefore, the New Hampshire Supreme Court's decision is neither contrary to nor an unreasonable application of Supreme Court precedent.

Even if a violation of the Confrontation Clause had occurred, however, any improper consideration of Dr. Fieseher's testimony by the jury would have been harmless. Given the scope and detail of the testimony given by Joseph Bader and others, Dr. Fieseher's testimony about Vicki's statements would not have "'had substantial and injurious effect or influence in determining the jury's verdict.'" Penry v. Johnson, 532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (internal quotation omitted)); see also Fryar v. Bissonnette, 318 F.3d 339, 342 (1st Cir. 2003); Fortini v. Murphy, 257 F.3d 39, 48 (1st Cir. 2001). Therefore, the Warden is entitled to summary judgment on Bader's claim arising from hearsay evidence.

D. <u>Jury Misconduct</u>

In the course of the jury's deliberations, "two court bailiffs reported to the trial judge that two jurors had approached them and asked to see the judge." <u>Bader</u>, 808 A.2d at 26. The jurors complained that the foreperson would not submit their questions to the judge. The judge held a chambers conference on the issue. During the conference, the judge received a question from the jury asking whether they needed to inform the judge that they had reached a unanimous verdict on one of the two charges against Bader before reaching a decision on the other charge. <u>Id.</u>

The defense moved for a mistrial and also asked the judge to individually voir dire the jurors as to what questions had not been submitted. The prosecution objected. The judge denied the defense motions. However, the judge instructed the jury, through a note, to continue its deliberations until it reached a verdict on both charges and cautioned the jury "that 'if any of the jurors have any other questions, please make certain that they are sent to me for response.'" <u>Id.</u> at 27 (quoting note). The next day the jury returned unanimous guilty verdicts on both charges, which were confirmed by polling the jury. Judge Murphy denied the defense motion to voir dire the two jurors who had earlier complained about questions not being answered.

25

On appeal, Bader argued that the intra-juror misconduct, indicated by the two jurors' complaints, prejudiced his right to a fair trial. The New Hampshire Supreme Court analyzed the claim under both state and federal law. The court concluded that because the trial court instructed the jury to send questions to the court for response and because the unanimous verdict was confirmed by polling the jury, any misconduct did not affect the fairness of the trial. Bader, 808 A. 2d at 29.

In this proceeding, Bader continues to argue that the complaints of the two jurors indicated juror misconduct, which, he contends, required the trial court to voir dire the jurors.[7] Because the trial court did not conduct voir dire, Bader argues that his Sixth Amendment right to a fair trial was violated.

The New Hampshire Supreme Court relied on United States v. Boylan, 898 F.2d 230, 258 (1st Cir. 1990). In Boylan, after the guilty verdict, a juror contacted one of the defense counsel to report that the jury was predisposed to find guilt. Id. at 257-58. The trial judge questioned the juror with all counsel present, and the juror revealed that a magazine article

_____

[7]Although Bader adds a reference to court coercion as part of his juror bias claim in the brief submitted in support of his habeas petition, neither he nor the Warden have addressed the court coercion argument for purposes of summary judgment. Therefore, the court concludes that the issue has been waived.

26

discussing one of the defendant's counsel had circulated among the jurors.  Id. at 258.  The trial judge then issued a decision that denied the defense motions for a new trial.  Id.  On appeal, the First Circuit considered Supreme Court precedent, along with other federal precedent, and concluded that the trial court was obliged to "fashion a responsible procedure for ascertaining whether misconduct actually occurred and if so, whether it was prejudicial," and had done so.  Id. (citing Smith v. Phillips, 455 U.S. 209 (1982).  The New Hampshire Supreme Court followed that guidance and affirmed the trial judge's handling of the jury issue in Bader's case.

Despite Bader's arguments to the contrary, no Supreme Court precedent requires a trial court to voir dire jurors or hold a hearing to investigate potential jury misconduct that arises from the jury's internal processes and relationships.  See Tanner v. United States, 483 U.S. 107, 120, 127 (1987); Mason v. Mitchell, 320 F.3d 604, 636 (6th Cir. 2003).  In addition, "[a] juror's acceptance of the verdict upon polling constitutes prima facie evidence of his/her participation in deliberations, lack of irregularity therein, and concurrence in the outcome, and said verdict should not be disturbed absent extraordinary circumstances . . . ."  United States v. Morris, 977 F.2d 677, 689 (1st Cir. 1992).  The state court decision is not contrary to

27

Supreme Court precedent.  Bader also has not shown that the state court decision is an unreasonable interpretation of Supreme Court precedent.  Therefore, the Warden is entitled to summary judgment on Bader's claim of alleged juror misconduct.

E.  New Evidence

Several weeks after Bader was convicted, he learned that Sandro Stuto, a witness for the state at trial, had told a fellow prison inmate, known as John Doe, that his trial testimony was false.[8]  Doe signed an affidavit on August 24, 1999, in which he stated that he was incarcerated with Stuto in March of 1998, when Stuto told him that Vicki Bader was murdered by Joseph Bader in exchange for sexual favors from Mary Jean Martin.  According to Doe's affidavit, Stuto said that he was working with Martin, who was after Bader's money, and Martin wanted his help in killing Vicki Bader.  He said that Seth Bader had nothing to do with the murder.  Doe also stated that he immediately told his lawyer, Philip Cross, about Stuto's statements.  John Doe underwent a polygraph examination on May 21, 2001, which was videotaped and a transcript was made of the proceeding.

Stuto was an Italian national living in this country.  The

_____

[8]Doe's true name was known to both Bader's counsel and the prosecution.

28

Immigration and Naturalization Service intended to deport him after he served his sentence for his participation in the murder of Vicki Bader. At the hearing held in this court on January 7, 2003, on Bader's motion for a preliminary injunction, Bader made it clear to the magistrate judge that he wanted to obtain Stuto's testimony. The magistrate judge directed the Warden to keep Bader informed of Stuto's whereabouts during the habeas proceeding.

On January 21, 2003, Bader filed a motion to have the INS produce Stuto for a deposition. The Warden had informed Bader that Stuto was paroled by the State of New Hampshire to the custody of the INS and that the INS had issued a detainer for Stuto's deportation to Italy. On January 29, 2003, the magistrate judge issued an order to have the INS produce Stuto for a deposition on February 12, 2003. The Office of the United States Attorney notified the court on February 7, 2003, that the INS had executed the deportation warrant and removed Stuto from the country on January 24, 2003. Therefore, Stuto was not deposed.

Bader contends that his right to due process was violated because Stuto's trial testimony, on behalf of the prosecution, was perjury. He further contends that the state "recklessly overlooked" Stuto's perjury at trial and that the state's actions

29

relative to Stuto's deportation demonstrate that the state knew Stuto would not deny that his trial testimony was perjury. The Warden argues that no due process violation occurred.

In response to the Warden's motion for summary judgment, Bader moves to "Hold Issue V in Abeyance Pending Discovery." To the extent Bader's motion is in the nature of a Federal Rule of Civil Procedure 56(f) motion to delay consideration of summary judgment on the perjury issue until further discovery is completed, it is insufficient to preclude summary judgment.

A party seeking relief under Rule 56(f) must articulate a plausible reason to believe that the requested discovery will produce information that would raise a trialworthy issue. See Filiatrault v. Comverse Tech., Inc., 275 F.3d 131, 138 (1st Cir. 2001). In habeas cases, discovery is available "if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise." Rule 6(a) of the Rules Governing § 2254 Cases. To apply Rule 6(a), the court must identify the essential elements of the claim. See Bracy, 520 U.S. at 904.

"First, it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." Napue v. Illinois, 360 U.S. 264, 269 (1959); see also Mooney v. Holohan,

30

294 U.S. 103, 112 (1935).  A due process violation occurs if the prosecution used evidence that it knew or should have known was false and "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  Agurs, 427 U.S. at 103; accord Mastracchio v. Vose, 274 F.3d 590, 601 (1st Cir. 2001).  In contrast, a recantation of trial testimony alone does not require overturning a conviction on due process grounds.  Hysler v. Florida, 315 U.S. 411, 413 (1942).

Bader states that his theory in support of his perjury claim is based on (1) the transcript of Doe's polygraph examination about Stuto's recantation, (2) his own affidavit in which he states that another "Doe" inmate would testify that Stuto told prosecutors that he would not provide any further testimony, and (3) Stuto's sudden deportation.  He seeks discovery as to whether Stuto refused to deny that he had recanted his trial testimony and whether the state "hustled" him out of the country to conceal that intent.  Because a recantation alone, without the prosecution's knowledge at the time of trial that the testimony was false, or reason to know that it was false, is not enough to support Bader's claim, the discovery Bader proposes is not likely to produce evidence to avoid summary judgment.  Bader's speculative and highly self-serving inferences are similarly insufficient to support a discovery request.  Therefore, his

31

motion is denied.

On appeal, the New Hampshire Supreme Court correctly identified the Napue standard when it stated that "federal due process is violated if a State knowingly uses false evidence, including false testimony, to obtain a tainted conviction, regardless that the false testimony goes only to the credibility of the witness." Bader, 808 A.2d at 32. The court reviewed the federal circuit court opinions Bader had cited and concluded that none of the cited opinions modified the Napue standard. In conclusion, the court affirmed the trial court's finding "that there is no basis to conclude that the prosecution knowingly presented false or perjured testimony in this case." Id. at 33.

Bader is entitled to habeas relief only if the state court's determination of the issue was contrary to or an unreasonable application of "clearly established Federal law, as determined by the Supreme Court of the United States," or the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d). Bader concedes that the prosecution did not actually know that Stuto's trial testimony was false. The Supreme Court has not addressed the issue of whether a due process violation occurs if a conviction is based on perjured testimony that was unknown to the prosecution at the time of

trial.  See, e.g., Jacobs v. Scott, 513 U.S. 1067 (Stevens, J. dissenting); Schaff v. Snyder, 190 F.3d 513, 530 (7th Cir. 1999); see also Drake v. Portuondo, 321 F.3d 338, 345 n.2 (2d Cir. 2003).  To the extent that Bader's claim is based on a theory that due process is violated by the state's innocent use of perjury to obtain a conviction, that theory is not supported by clearly established Supreme Court precedent and, therefore, fails.

Bader also argues that the prosecution was reckless or closed its eyes to Stuto's false testimony.[9]  The "should have known" aspect of Agurs is not well-developed.  See Drake, 321 F.3d at 345.  Agurs did not involve false or perjured testimony and, therefore, offers no clarification of the "should have known" standard.  See id., 427 U.S. at 99-102; see also Drake, 321 F.3d at 345 (suggesting that "should have known" is mere dictum).  Bader contends that the prosecution's reckless use of perjured testimony is a due process violation.[10]

_____

[9]The New Hampshire Supreme Court does not appear to have considered this part of the issue, and it is unclear to what extent this issue was presented there.

[10] Bader cites United States v. Sinclair, 109 F.3d 1527, 1532 (10th Cir. 1997), which discusses the Agurs materiality standard in light of the nature of prosecutorial misconduct and assumes, without analysis, that reckless or negligent use of false testimony would violate due process under Agurs.

33

Assuming for analysis only that Stuto's trial testimony was false and that the "should have known" aspect of Agurs is clearly established within the meaning of § 2254(d), Bader must demonstrate that the prosecutors should have known that Stuto's testimony was false at the time of trial.[11]  It is undisputed that Stuto's alleged recantation occurred long after trial. There is no direct evidence that the prosecution knew that Stuto's testimony was false at the time of trial.  Although the state may have been eager to assist in Stuto's deportation, Bader's inference of prosecutorial complicity in perjury at trial, based on the deportation, is not persuasive.  Bader offers no persuasive evidence or inference to support his accusations that the prosecution was reckless or closed its eyes to Stuto's allegedly false testimony at trial.  Therefore, because the record does not support Bader's inference that the prosecution should have known of Stuto's false testimony at trial, it is not necessary to consider the materiality of that testimony.  Summary

_____

[11]Accepting that Doe is truthful about Stuto's recantation, nothing establishes that the recantation itself was truthful. Bader states that Stuto had a history of bragging about his criminality.  Recantations to fellow inmates are viewed with considerable skepticism.  See, e.g., United States v. Gonzalez, 258 F.3d 16, 23 (1st Cir. 2001); Olson v. United States, 989 F.2d 229, 231 (7th Cir. 1992); United States v. Provost, 969 F.2d 617, 620 (8th Cir. 1992); United States v. Carbone, 880 F.2d 1500, 1502 (1st Cir. 1989); United States v. DiPaolo, 835 F.2d 46, 49 (2d Cir. 1987).

judgment is appropriate in favor of the Warden on this issue.


## Conclusion

For the foregoing reasons, the respondent's motion for summary judgment (document no. 65) is granted.  The petitioner's motion for summary judgment (document no. 26) and his motion to hold issue five in abeyance (document no. 71) are denied.

The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

May 28, 2003

cc:  B. Michael Cormier, Esquire
     Neals-Erik W. Delker, Esquire
     Peter E. Papps, Esquire