# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs November 10, 2009

## STATE OF TENNESSEE v. BRENT R. STEWART

**Circuit Court for Dyer County**
**Nos. C05-116, C05-424   Lee Moore, Judge**

**No. W2009-00980-CCA-R3-CD  - Filed August 18, 2010**

In this appeal, the defendant claims that his due process rights were violated because the judge presiding over his probation revocation had previously served as a member of his drug court team and had received *ex parte* information regarding the defendant's conduct at issue by virtue of his prior involvement. After due consideration, we agree that the Due Process Clause requires that a defendant's probation revocation be adjudicated by a judge who has not previously reviewed the same or related subject matter as part of the defendant's drug court team. Accordingly, we reverse the decision below and remand the defendant's case for a new hearing in front of a different judge.

**Tenn. R. App. P.3 Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and J.C. MCLIN , JJ., joined.

Noel H. Riley II., Dyersburg, Tennessee, for the appellant, Brent R. Stewart.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; C. Phillip Bivens, District Attorney General; and Karen Burns, Assistant Attorney General, for the appellee, State of Tennessee.

## OPINION

### Background

In 2003, the Tennessee Legislature passed the Drug Court Treatment Act (DCTA), T.C.A. §16-22-101 *et seq*. (2010), in an effort to reduce the incidence of drug use (and crimes committed as a result of such drug use) in the criminal justice system. The DCTA

generally empowers courts to create drug court treatment programs in order to supervise and support the efforts of participating individuals to achieve abstinence from drug and alcohol use. Unfortunately, for such a grand purpose, judges were provided comparatively little instruction as to how to carry out the numerous functions that this broad task necessarily entails. We recently confronted some of the many issues attendant to the implementation of the DCTA in *State v. Stewart*, No. M2008-00474-CCA-R3-CD, 2008 WL 4467179 (Tenn. Crim. App., at Nashville, Oct. 6, 2008), and are now called upon to do so again.

The case at bar arises out of a probation revocation. The defendant pled guilty in April 2005 to theft of property over $1000, a Class D felony. In September 2005, the trial court sentenced the defendant to three years in the Tennessee Department of Correction as a Range I, standard offender. Also in September 2005, the defendant pled guilty to burglary, a Class D felony, and was again sentenced to three years in the Tennessee Department of Correction as a Range I, standard offender.

While the record before this court is not as complete as might be desired, it appears that after serving six months in confinement, the defendant was released from the Department of Correction and placed on supervised probation. During his time on supervised probation, the defendant violated his probation terms, and, on April 3, 2007, he agreed to a partial revocation of his probation that included an additional six months jail time and enrollment in a drug court treatment program. This type of program, which has become increasingly common over the last twenty years, generally represents a commingling of the traditional criminal law process with the provision of social services, drug addiction treatment, interdisciplinary education, and community outreach. *See generally* T.C.A. § 16-22-104 (elucidating drug court general principles). Unlike the traditional court system, which focuses on establishing guilt and punishing the defendant's conduct, drug courts focus on treating the defendant's underlying addiction. *See* Susan Pace Hamill, *Essay: An Argument for Providing Drug Courts in all Alabama Counties Based on Judeo-Christian Ethics*, 59 ALA. L. REV. 1305, 1306 (2008).

In Tennessee, the legislature intended for drug courts to operate in accordance with general principles "as established by the National Association of Drug Court Professionals, Drug Court Standards Committee." T.C.A. § 16-22-104. Consequently, in Tennessee drug courts, alcohol and drug treatment services are to be "integrated" with traditional "justice system case processing." *Id.* at § 16-22-104(1). In an overall attempt to reduce the incidence of drug use and addiction among program participants, in drug courts, the traditional hallmarks of the criminal justice system – the adversarial role of the prosecutor and defendant, with the judge acting as a dispassionate arbiter between the two – are reversed. The prosecutor and defense lawyer are directed to work together using a "nonadversarial role," with an eye toward promoting public safety. *Id.* at § 16-22-104(2). Judges are

required to engage in "ongoing judicial interaction with each drug court participant," *id.* at § 16-22-104(7), that "step[s] beyond their traditional independent and objective arbiter roles" and "communicates to participants–often for the first time – that someone in authority cares about them and is closely watching what they do." THE NATIONAL ASSOCIATION OF DRUG COURT PROFESSIONALS, DRUG COURT STANDARDS COMMITTEE, DEFINING DRUG COURTS: THE KEY COMPONENTS 15 (U.S. Dep't of Justice, Bureau of Justice Assistance 1997) (hereinafter "DRUG COURT COMPONENTS"). In other words, "[t]he judge plays an active role in the treatment process." *Id.* at 2.

Prior to enrolling in a drug court program, the participants, while represented by counsel, usually sign an agreement forfeiting certain of their legal rights. *See id.* at 4; *see also* Hon. Peggy Fulton Hora, *Drug Treatment Courts in the Twenty-First Century: the Evolution of the Revolution in Problem-Solving Courts*, 42 GA. L. REV. 717, 746 (2008). The participants usually agree to comply with the terms of the drug court program and are informed that, as a result of the waiver of their legal rights, any violation of program obligations may result in punishment. *See* Hora, 42 GA. L. REV. at 4. Participants are typically informed that program obligations include "frequent alcohol and drug testing" for purposes of monitoring abstinence, *see* T.C.A. § 16-22-104(5), and frequent "judicial interaction" including meetings and status hearings, *see id.* at §16-22-104(7).

When participating as a member of a drug court team, judges are directed to be intimately involved in each step of the participant's treatment process. When judges see "positive signs" (i.e., signs of abstinence and program compliance), judges are instructed to issue "encouragement and praise from the bench," reduce supervision, reduce incarceration, provide "tokens of progress," and oversee ceremonies advancing the participant to more advanced treatment stages. DRUG COURT COMPONENTS at 14. When faced with signs of noncompliance, judges are directed to use a wide panoply of sanctions, including admonishment from the bench, increased monitoring, "[c]onfinement in the courtroom or jury box," fines, and "escalating periods of jail confinement." *Id.* The overall goal is to have program participants graduate after a prolonged period of abstinence, cured of their addiction at a rate that far exceeds that of the traditional criminal justice system. *See* Hora, 42 GA. L. REV. at 719 (noting that absent drug court intervention, in the traditional criminal system, "[n]early seven in ten convicted drug offenders reoffends [sic] within three years of release from incarceration.").

Drug court programs often do valuable work and serve an increasingly important role in our society. Transcending their humble beginnings as an experiment in Miami, Florida, there are more than two thousand drug courts in operation today, with many more on the way. *See* C. West Huddleston *et al.*, PAINTING THE CURRENT PICTURE: A NATIONAL REPORT CARD ON DRUG COURTS AND OTHER PROBLEM-SOLVING COURT PROGRAMS IN THE UNITED STATES

2 (U.S. Dept. of Justice, Bureau of Justice Assistance 2008) (hereinafter "DRUG COURT REPORTS"). Research and focus groups have found that the "drug courts are increasingly reaching populations of individuals with very serious problems and needs." John S. Goldkamp, *The Drug Court Response: Issues and Implications for Justice Change*, 63 ALB. L. REV. 923, 960 (2000). Several scientific studies have concluded that drug courts reduce crime rates, anywhere from an average of seven to fourteen percentage points. *See* DRUG COURT REPORTS at 6. Numerous studies have also shown that drug court graduates are significantly less likely to be re-arrested following their release from the justice system than drug offenders who have not participated in the program. *See id.* By lowering crime rates, reducing the number drug offenders that are hospitalized or incarcerated, and reducing the number of babies that are born after prolonged prenatal drug exposure, drug court programs have had the salutary effect of saving taxpayers a significant amount of money in the jurisdictions where they operate. *See id.* at 6-7, 15. Many program graduates credit the drug courts with giving them, for the first time, a sense of self-esteem and hope for the future – in addition to curing their addictions. *See id.* at 3-4, 14-15.

The case before us today, however, is not a shining example of a successful drug court program intervention. During his tenure in the program, the defendant had ongoing issues with marijuana usage and repeatedly failed to comply with basic program requirements. As a result of his behavior, the defendant was "sanctioned" five or six times and sentenced to significant jail terms wholly outside of those envisioned by his original sentence or probation. On June 18 or 19, 2007, the drug court team found that the defendant was using drugs and alcohol and sanctioned him to jail for either fourteen days (according to the hearing transcript) or forty-five days (according to the "offender violation report" contained in the technical record) in jail. On August 7, 2007, the drug court team found that the defendant missed a meeting and ordered him taken into custody. On August 7 or 28, 2007, the drug court team determined that the defendant had failed a drug test and, combined with the earlier missed meeting, sentenced him to either ninety days (according to the hearing transcript) or forty-five days (according to the violation report) of incarceration. On December 11, 2007, the drug court determined that the defendant had violated a house arrest rule, had consorted with known felons, and had failed to report to his probation officer, and he was given another sixty-day sanction. On February 26, 2008, the drug court determined that the defendant failed a drug screen, and it imposed a fourteen-day sanction. Finally, on July 15, 2008, the drug court found that the defendant failed to report for drug testing and missed a weekly meeting, and it imposed a one-week jail sanction. Altogether, during his tenure in the drug court program, the defendant was sentenced to around six months additional jail time as sanctions for his repeated failures to comply with his drug court obligations. In the end, sometime in August of 2008, the drug court team found that the defendant had failed another drug screening and voted to expel him from the program. Notwithstanding the difficulties he experienced during his tenure in the program, the defendant credited the Tennessee drug

court program with saving his life.

On September 29, 2008, the Westate Corrections network charged the defendant with violating the special conditions of his drug court sentence and sought to have his probation revoked. The alleged violations included his testing positive for marijuana on August 25, 2008, missing four required weekly meetings on August 11, 2008; August 18, 2008; August 25, 2008; and September 1, 2008, and being away from his home during home visits on July 26, 2008; August 18, 2008; and August 24, 2008.

A probation revocation hearing was held on February 10, 2009, before a trial judge who had participated in a significant amount of the defendant's drug court treatment, including his expulsion from the program. The defendant urged the trial judge to recuse himself because of his prior participation on the drug court team, arguing that the judge would already be familiar with the materials that would comprise most of the State's proof at the probation revocation by virtue of his involvement. However, the trial judge declined to recuse himself, citing the practical difficulties of bringing in a new judge every time someone violates their drug court contract. However, the judge concluded that the defendant had raised a valid issue regarding his level of involvement with the subject matter and stated that he would not mind getting further guidance from the Court of Criminal Appeals on the issue as it was likely to arise again in other cases.

At the hearing, the defendant's case officer testified that the defendant tested positive for marijuana on August 25, 2008, and that the defendant missed the four weekly meetings and three in-home visits discussed above. In response, the defendant admitted on the stand to having difficulty quitting marijuana but claimed he had only missed one weekly meeting and that he had missed only one in-home visit after obtaining prior permission. After reviewing the evidence, the trial court judge found that the defendant had violated the terms of his probation and reinstated his original six-year sentence, with credit for time served during earlier probation revocations but not for time served as a sanction for violating the drug court program rules. This appeal followed.

Analysis

The defendant claims that the Due Process Clause and the Tennessee Code of Judicial Conduct both compel the conclusion that a trial judge who has participated as a member of a defendant's drug court team cannot subsequently preside over the defendant's probation revocation hearing after the defendant has been discharged from the program. After reviewing precedent, we conclude that the Due Process Clause does indeed bar any member of the defendant's drug court from adjudicating a subsequent parole revocation *when the violations or conduct at issue in both forums involves the same or related subject matter*.

Consequently, we find it unnecessary to address whether the Code of Judicial Conduct contained in the Tennessee Supreme Court Rules would also generally require recusal under these circumstances.

## I.

It is by now firmly established that a probationer is entitled to due process when a State attempts to remove his probationary status and have him incarcerated. *See Gagnon* v. *Scarpelli*, 411 U.S. 778, 785-86 (1973). That process includes, at a minimum:

> (a) written notice of the claimed violations of [probation or] parole; (b) disclosure to the [probationer or] parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a "neutral and detached" hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking [probation or] parole.

*Id.* at 786 (*quoting Morrissey* v. *Brewer*, 408 U.S. 471, 489 (1972)) (bracketed changes in original); *see also Stewart*, 2008 WL 4467179, at *4 (holding a trial judge violated the defendant's due process rights when it allowed the defendant's drug court team to effectively decide a matter that was vested by statute in the trial judge's authority). One of the most fundamental of these due process rights is the right to a neutral hearing body; a defendant's rights are plainly violated when his probation revocation case is reviewed by something other than a "neutral and detached" arbiter.[1]

Yet, the role of a judge in the drug courts program is, by its very nature, almost the polar opposite of "neutral and detached." The Tennessee Drug Court Treatment Act of 2003 specifically states that drug court programs are to operate according to the principles established by the Drug Courts Standards Committee of the National Association of Drug Court Professionals. *See* T.C.A. § 16-22-104. Because the legislature has not expounded

---

[1] In this state, trial judges are the statutorily-prescribed probation revocation hearing body, *see Stewart,* 2008 WL 4467179 at *4, and their nature as neutral and detached arbiters is ensured by the Tennessee Code of Judicial Conduct, which requires disqualification of a judge "in a proceeding in which the judge's impartiality might reasonably be questioned." Tenn. R. Sup. Ct. 10, Canon 3E(1).

further on these general principles, courts are presumably to seek clarification from the drug court program guidelines promulgated by that same body, which expressly "require judges *to step beyond* their traditionally independent and objective arbiter roles. . . ." DRUG COURT COMPONENTS at 15 (emphasis added). On one hand, pursuant to the guidelines, a drug court judge is often directed to appear to be in the defendant's corner during the drug court process. Drug court guidelines require a participating judge to "communicate[] to participants – often for the first time – that someone in authority cares about them." *Id.* The guidelines explain that a drug court judge should issue praise for regular attendance or a period of clean drug tests, offer encouragement, and even award the participants tokens of accomplishment during open court ceremonies for completing particular phases of treatment. *See* DRUG COURT COMPONENTS at 13. This type of activity will almost inevitably lead to situations in which, at a later probation revocation, the prosecution can rightfully complain that a judge's appearance of neutrality has been compromised. For example, in situations in which a drug court judge has repeatedly praised the defendant for reaching program milestones, including pining medals on him or her in open court for various program accomplishments, the prosecution might reasonably question a judge's impartiality when reviewing a probation revocation motion based on program failures that occurred during the same time period.

On the other hand, the drug court guidelines also require a judge to simultaneously engage in behavior that communicates to participants that "someone in authority . . . is closely watching what they do." *See* DRUG COURT COMPONENTS at 15. Judges are to have frequent status hearings and maintain regular communication with other program staff in order to uncover noncompliance "immediately." *See id.* at 14. In response, the drug court is supposed to adopt measured responses with special emphasis on "the predictability, certainty, and swiftness of their application." *Id.* In essence, far from remaining neutral, the drug court judge is sometimes supposed to instill in the participant the fear that big brother is always watching him, ready to pounce upon each and every infraction, and immediately address it with responses ranging from disparaging remarks to jail time. When acting in this role, judges will often have to take steps that could cause the defendant to reasonably question the judge's impartiality when reviewing the same subject matter in a different forum later. For example, after a drug court team has determined that a defendant missed several meetings, and the judge, in response, has castigated the defendant in an invective-laden tirade about the severity of his behavior, a defendant might reasonably be concerned about that same judge's impartiality at a later parole revocation hearing at which he intends to argue that his infractions were, in fact, not all that serious. This concern is even greater in situations in which the judge has sentenced the defendant to jail time for a series of infractions because, once having found a given set of infractions severe enough to merit jail time during the drug court process, a defendant might reasonably be concerned that a judge would look with disfavor on any argument that he should reach the precise opposite

conclusion when examining the exact same conduct in a different forum.

Even laying aside the concern that forcing a drug court judge to adopt these opposing "mentor" and "big-brother" roles necessarily compromise his appearance of neutrality when reviewing the same conduct at a probation revocation, due process also guarantees that the arbiter of a defendant's parole revocation will be "detached." A trial judge will necessarily find it difficult, if not impossible, to reach the constitutionally-required level of detachment when dealing with a course of conduct he has previously reviewed as a member of a drug court team. Rather than being "detached" when participating in a drug court, a judge is expected to "play an active role in the [participant's] drug treatment process." DRUG COURT COMPONENTS at 2. The drug court judge is supposed to be an integral part of the defendant's "therapeutic team." *See id.* at 7. The drug court judge is instructed to praise each success and criticize each failure. *See id.* In short, the drug court judge is compelled by the very nature of the program to become closely involved with the participant and his activities.

Perhaps more importantly, in conjunction with other team members, the drug court judge is charged with making the highly personal decision of which drug-related treatments and other services will best serve the participant's needs. *See id.* Having made that decision, the judge and other team members cannot help but develop a stake in the success or failure of the chosen program. If the participant succeeds in a particular treatment program, their good judgment will be affirmed, but, if the participant fails at program after program that they have chosen for him, it may reflect poorly on their judgment as treatment professionals. Consequently, far from being detached, by the time he or she approaches any probation revocation hearing involving the same subject matter, any active drug court team member will already be firmly tied to the defendant's successes or failures.

In addition, as part of the "therapeutic process," the drug court team is directed to consider and address the many problems that may occur with drug addition, including other medical problems, family difficulties, financial difficulties, and childhood sexual abuse. *See id.* Successfully addressing these related issues require members of the drug court team to identify with and bond with the participant, at least to some degree. For example, drug court team members may have to temporarily act as *de facto* marriage counselors for a short time if a participant "falls off the wagon" when his or her spouse leaves. But, after having gotten so intimately familiar with the participant's personal heartache and provided counseling and advice in way of treatment, it would seem difficult, if not impossible, for a trial judge to completely detach himself when reviewing a probation revocation based on the defendant's substance abuse or other violations during that same time period. In short, effective participation as the leader of the defendant's therapeutic team will, in many cases, require a degree of involvement in the defendant's personal issues that is inconsistent with the detachment that due process requires for adjudication of a parole revocation.

The collaborative nature of the decision-making involved in the drug court process poses an additional threat to the impartiality of any judge who would later adjudicate a defendant's probation revocation involving the same or related conduct. While participating in the drug court program, a judge is expected to engage in a shared decision-making process. *See* DRUG COURT COMPONENTS at 2. In making decisions, he or she is instructed to solicit advice from the prosecutor, case managers, and the staff of various programs. *See id.* at 7. At times, the drug court judge may rightfully elect to defer or subordinate his or her own individual judgment to that of one or more knowledgeable team members regarding the best steps to take to further the defendant's treatment or the proper sanctions for particular acts of noncompliance. As part of the collaborative process, the drug court might even put certain issues to a vote and follow the will of the majority rather than his own.[2] But, once the drug court team has found that certain violations have occurred and responded to them using this collaborative process, the judge, as a team member, will necessarily become invested in those decisions. The judge's status as a member of the drug court team suggests, at the very least, that the judge will be partial to that body and look favorably on the decisions it has made. When reviewing the same or related conduct at a subsequent probation revocation hearing, the judge's investment in those prior collaborative team decisions may well cloud the exercise or his or her own individualized, detached, and impartial review of the evidence and weighing of potential punishments.

Finally, even if this court were to ignore all these concerns, we would find that due process requires a different judge to adjudicate a probation revocation hearing involving the same subject matter because of the considerable amount of *ex parte* information received by the drug court judge as a necessary component of the drug court process. It is fundamental to the concept of a fair hearing that a judge not receive information relevant to the disposition of a case outside the adjudicatory process and outside the presence of one or both parties. It is for this very reason that the Tennessee Code of Judicial Conduct requires judges to refrain from communications made outside the presence of the parties concerning a pending proceeding. *See* Tenn. R. Sup. Ct. 10, Canon 3B(7).

Participation on a drug court team, however, necessarily exposes the judge to considerable information in a manner considered *ex parte* in more traditional judicial fora. The drug court judge and treatment providers are directed to "maintain ongoing communication, including frequent exchanges of timely and accurate information about the individual's program performance." DRUG COURT COMPONENTS at 2. This communication will sometimes, if not frequently, occur outside the presence of the defendant. This type of information exchange poses obvious concerns if a judge later sits on a probation revocation

---

[2] If a judge were to engage in similar activity at a probation revocation hearing, it would be unconstitutional. *See Stewart*, 2008 WL 4467179, at *4.

hearing involving the same subject matter. Consider the case of a judge who has, during his or her time on the drug court, received numerous phone calls from a defendant's Alcoholics Anonymous supervisor or sponsor relaying concerns such as the defendant "met with me and told me he is slipping," or the defendant "met with me and had alcohol on his breath," or the defendant "told me he thinks about drinking all the time." In some such cases, the defendant may not even be aware that these phone calls occurred, as the drug court team might deem keeping this information (and its source) confidential from the defendant to be important to the defendant's treatment process. In this type of situation, the defendant cannot possibly mount an effective rebuttal of these allegations; he is unaware that they exist. Yet, it simply strains credulity to believe that judges could or would consistently set aside all of the considerable amount of information they receive in this *ex parte* manner at a later probation revocation.

In addition, the drug court program envisions that there will be frequent interactions between the participants and drug court judges, in which the participants will not be represented by counsel. In order to assist the drug court team in providing participants with the most effective level of addiction treatment, the guidelines encourage program participants to "admit[] to [alcohol or drug] use in open court," reasoning that participants will do so "because criminal prosecution for admitting to [such] use will not be invoked." DRUG COURT COMPONENTS at 4. As a result of these frequent interactions, in the normal course of participating on a drug court team, the drug court judge will necessarily receive what is tantamount to numerous confessions of behavior that violates the terms of the defendant's probation, all made while the defendant does not have access to counsel. It will be extremely difficult for a judge to appear impartial if, after hearing such a confession (and presumably having acted upon it), he or she confronts the same issue at a probation hearing. Likewise, in many of these one-on-one meetings, the defendant may make exculpatory claims or provide the judge with exculpatory evidence outside the presence of the prosecutor or correctional representative. The prosecution may rightfully question whether it is receiving a fair bite at the apple when it has no idea what exculpatory information the judge may have received and, therefore, has had no opportunity to challenge it.

Finally, participation in a drug court program necessarily exposes any judge to a considerable amount of information about the defendant's conduct that would not normally be relevant to adjudicating a probation revocation, through methods that leave its credibility suspect for traditional legal purposes. As we have noted above, the guidelines provide that "the drug court team also needs to consider co-occurring problems" in the course of treating the defendant. DRUG COURT COMPONENTS at 7. Such problems include the participant's mental illnesses, sexually transmitted diseases, domestic violence, unemployment, and homelessness. *See id.* Consequently, in the course of the drug court program, a judge might find himself or herself in situations such as receiving a letter from the participant's friend,

a physician, claiming that the defendant's recent marijuana use is likely the result of his or her undiagnosed clinical depression, or the judge might hear the defendant's spouse claim in a meeting that the defendant came home drunk last Thursday and was so angry that he broke their television set. Due consideration of these unsworn *ex parte* allegations may be extremely valuable in considering the defendant's course of treatment, which might then be amended to include psychological evaluation and therapy in the former case or anger management evaluation and treatment in the latter. However, at a defendant's subsequent probation revocation hearing, questionable evidence of these and other irrelevant co-occurring problems might improperly play a role in aggravating or mitigating the defendant's punishment. Serious due process concerns are raised when a judge has received evidence pertaining to these co-occurring problems outside the presence of the defendant and/or his counsel (not to mention the State), because the parties may have no opportunity to challenge or rebut the allegations.

In the case at bar, because of his participation on the drug court team, the trial judge could not help but be aware of information about the defendant's conduct at issue above and beyond the evidence that was actually presented by either party at the probation revocation hearing. In making his ruling, for example, the trial judge noted that, during a meeting regarding the defendant's fourth set of sanctions, the defendant did not tell the truth to the drug court. We do not find any evidence bearing on the defendant's veracity on this particular day appearing anywhere else in the record of his revocation hearing.

Because the defendant, himself, testified in his defense at his probation revocation hearing, evidence bearing on his veracity would necessarily have been of crucial importance to his adjudicator's decision-making process. Yet, because the trial judge was already intimately familiar with the subject matter at hand and had made a prior determination regarding the defendant's untruthfulness on an earlier occasion, the prosecution never had to raise the issue of the defendant's prior alleged instance untruthfulness during its cross-examination of the defendant in order to put this issue bearing on the defendant's credibility before the judge. Because it was not necessary for the prosecution to challenge the defendant's credibility during cross-examination with any evidence of the prior alleged incidence of untruthfulness, the defendant was deprived of any meaningful opportunity to rebut the allegation of untruthfulness during a potential redirect examination in advance of having his credibility weighed by the trial judge. While this one specific example plainly illustrates the due process concerns created by having a judge at parole revocation review the same subject matter that he has previously addressed as a drug court team member, there are literally countless possible ways in which a judge might rely on information gained during the collaborative, therapeutic process in his or her subsequent decision-making, all without affording the defendant the warning necessary to alert him or her of the need to address the issue during his or her turn to present evidence.

In ruling that the due process concerns attending a trial judge's receipt of *ex parte* information during the drug court treatment process prohibits the same judge from adjudicating a parole revocation based on the same or related subject matter, our decision today is in accord with our earlier decision in *State v. Stewart. See* 2008 WL 4467179, at *4-5. In that case, this court held that it was a violation of due process for a trial judge to rely exclusively upon the recommendation of a drug court team when deciding whether to revoke the defendant's probation, explaining that this method was "outside the statutory procedure." *Id.* at *4. Notably, on remand, this court took the extraordinary step of assigning the case to a different trial judge. Citing the Tennessee Code of Judicial Conduct provisions prohibiting *ex parte* communications and requiring disqualification of judges in cases in which their impartiality might reasonably be questioned, *see* Tenn R. Sup. Ct. 10, Cannons 3B(7) & 3E(1), this court expressed concern that "the trial judge received communication outside the presence of the parties concerning the matter and relied on that communication in disposing of the case" and ultimately concluded that "on remand the case shall be assigned to another judge." *Id.* at *5. While in *Stewart,* the *ex parte* drug court communication addressed actually occurred while the probation revocation was *pending* (because the defendant was not expelled from the drug court program until after his probation revocation), we do not believe that the due process concerns in the case at bar are any less significant. Participation on a drug court team necessarily exposes a judge to *ex parte* contacts with fellow team members and others concerning the defendant's activities, and the fact that the participant's expulsion from the drug treatment program in this case occurred before the inevitable related probation revocation, rather than during its pendency, does not sufficiently distance the judge from the subject matter to the extent necessary to restore the constitutionally-required degree of impartiality.

For all these reasons, we hold that a member of the defendant's drug court team cannot function as a "neutral and detached" hearing body (as required by *Scarpelli*) for alleged probation violations that are based on the same or related subject matter that has been reviewed by the drug court. In reaching our decision today, we acknowledge that at least two other jurisdictions have examined this issue and reached the opposite conclusion. We are not persuaded by their reasoning. In *Idaho* v. *Rogers*, 170 P.3d 881, 886 (Idaho 2007), the Supreme Court of Idaho held that a defendant's "drug court judge may serve as the [probation revocation hearing] judge," based solely on its observation that "information from the termination proceedings would be admissible in a sentencing hearing." It is true that much of the information a judge has acquired as a member of the drug court team might be properly placed before him as evidence during a probation revocation hearing, but this fact in no way alleviates all of the due process problems attendant to permitting judges to play such dual roles with respect to the same subject matter. All of the particular information a judge might learn by actually witnessing a bank robbery, for example, might be admissible

as evidence and properly placed before him in a later criminal trial, but the Due Process Clause doubtlessly prevents any defendant's case from being reviewed by a judge with such first hand knowledge of the crime. For due process purposes, the Constitution is concerned not just with *what* a judge knows, but *how* the judge knows it.

We are similarly unpersuaded by *New Hampshire* v. *Belyea*, No. 90-345, 2010 N.H. Lexis 49 (N.H. Sup. Ct., May 20, 2010), in which the Supreme Court of New Hampshire held that a trial judge's presiding over a defendant's drug court program did not create an appearance of impropriety that would necessitate recusal from a subsequent probation revocation under the state constitution. That court's decision was based, in part, on the defendant's failure to adequately brief the issue, *see id.* at *19, and on the fact that the evidentiary facts of that case were not in dispute, *see id.* at *17-*18. Setting these case-specific concerns aside, the court's reasoning appears primarily to be the fact that "[i]t is not uncommon for judges to acquire information about a case while sitting in their judicial capacity *in one judicial setting* and later to adjudicate the case without significantly casting doubt on their ability to render a fair and impartial decision." *Id.* at 14 (emphasis added).

While we do not take issue with the foregoing statement, it far from alleviates our constitutional concerns. Drug court programs contain numerous aspects that differentiate them from traditional judicial settings. Drug court judges are required to "step beyond" their roles as independent and objective arbiters and "play an active role" in the treatment process. DRUG COURT COMPONENTS at 2, 15. Drug court judges are directed to remain in ongoing *ex parte* contact with other members of the drug court therapeutic team. *See id.* at 7. The outcomes reached and any sanctions imposed by the drug court team are supposed to be the result of a shared, collaborative process. *See id.* at 1, 14. Drug courts should have a "nonadversarial atmosphere." *Id.* at 3. None of these practices would pass constitutional muster in a traditional judicial setting. A judge's participation in these practices in the drug court context consequently raises grave due process concerns about his or her appearance of neutrality that simply do not arise when the judge has previously addressed subject matter in other judicial settings.

Our point is well illustrated when the case at bar is placed in contrast with the sole case cited by the New Hampshire Supreme Court in reaching its opposite conclusion, *State* v. *Bader*, 808 A.2d 12, 19-21 (N.H. 2002). In that case, the New Hampshire Supreme Court upheld, against a due process challenge, a judge's decision to preside over the defendant's criminal trial after presiding over portions of a tort proceeding involving the same subject matter. *See id.* at 19-21. Both civil and criminal trials are traditional judicial settings, and a single judge shifting from one to another poses far fewer concerns than the situation we face today. Neither setting forces the judge to shed his neutral and detached role as the drug court program does. In both contexts, all of the information the judge has obtained regarding

the subject matter has been placed before him or her pursuant to evidentiary rules. The judge has received no *ex parte* information concerning the case in either setting. Finally, the outcome reached in both cases is the result of the judge's solitary consideration of the fruits of the adversary process. In short, adjudicating two traditional judicial proceedings involving the same subject matter simply does not raise the same due process concerns as adjudicating a traditional judicial proceeding after having participated in a quasi-judicial, collaborative drug rehabilitation program.

We recognize and regret that our holding today may impose significant hardship on jurisdictions, such as the one in which this cases arises, in which there are a limited number of judges. However, any acrimony over today's decision in these jurisdictions should be tempered by the fact that judicial rules governing recusal motions in Tennessee appear to be changing in a way that renders the use of additional judges in these situations almost inevitable. Proposed Rule 2.11(D) of the Tennessee Code of Judicial Conduct governing judicial disqualification provides that judges, after the filing of a motion seeking their disqualification, must promptly issue a written order either: (1) granting the motion, (2) denying the motion as frivolous, or (3) requesting that the presiding judge of the judicial district assign another judge to hear and decide the recusal motion. *See* TENNESSEE BAR ASSOCIATION, REPORT OF THE TENNESSEE BAR ASSOCIATION TASK FORCE ON JUDICIAL CONDUCT RULES 24 (2010). Given that most defendants whose probation revocation is being adjudicated by a former drug court team member could seemingly file a motion for disqualification that is, at least, non-frivolous, most motions that are filed may well soon require the intervention of a different judge in any event. If these proposed changes were to pass, it would not take long for trial judges to realize that they may as well grant most non-frivolous recusal motions, for it would often be about as easy for a new trial judge to adjudicate the probation revocation itself as the related recusal motion. Consequently, the practical effect of this decision in Tennessee may simply be to accomplish *de jure* through the Due Process Clause the same outcome as would have been obtained *de facto* through the proposed changes to the Code of Judicial Conduct.

Regardless, in jurisdictions with limited judicial resources, judges will often continue to need to wear multiple hats in order to fulfill their various responsibilities, and we do not intend to call the majority of those practices into question today. But, judicial resource limitations notwithstanding, in the interest of justice, a different judge needs to sit to hear a probation revocation when the subject matter of the probation violation is the same or related to subject matter that has been reviewed by the judge during a drug court program. In many cases, the outcome of the proceedings will no doubt be the same, but the task placed before us today is to opine on the strictures of the Due Process Clause, and, where due process is concerned, it is the process, not the particular outcome, that matters. It is imperative that defendants subjected to probation revocation receive a hearing before a neutral adjudicator,

and a judge that has previously dealt with the same or related subject matter as a member of a drug court team simply cannot fulfill this role.

## II.

Having reviewed the record, we are additionally troubled by the four or five occasions where the defendant in this case was "sanctioned" to significant jail time by the drug court team during the two years he participated in the program. It is true that the drug courts program specifically envisions that a participant's noncompliance may be sanctioned by escalating periods of jail confinement.[3] *See* DRUG COURT COMPONENTS at 14. Regardless, the net effect of these sanctions appears to be that approximately a half-year has been tacked onto the overall defendant's sentence. In other words, as things stand now, the defendant is appreciably worse off from a punitive perspective than if he had chosen not to participate in the drug court program at all and had simply elected to serve his suspended sentence in full from the outset.

Leaving aside (as we must) the obvious due process concerns attendant to any additional deprivation of the defendant's liberty that has been imposed through a collaborative, non-adversarial, and at times *ex parte* process rather than through a traditional adversarial evidentiary hearing,[4] there is considerable tension between this outcome and the general guidelines under which drug courts should operate. The drug court program explicitly recognizes that alcohol and drug addition "is a chronic, relapsing condition," that "many participants [will] exhibit a pattern of positive urine tests," and expressly contemplates that many participants will experience periods of relapse "[e]ven after a period

---

[3] The Drug Court Standard's Committee does not explain whether this jail time is considered a partial probation revocation (and thus constitutes only a deprivation of the participant's "conditional" right to liberty for due process purposes) or an entirely separate punishment (which by virtue of depriving the defendant of time he would otherwise presumably have spent as a free member of society, may constitute a more constitutionally-suspect deprivation of the participant's "absolute" right to liberty). The trial court, by virtue of denying the defendant credit towards his sentence for the time served, appears to have adopted the latter view.

[4] Drug court participants typically sign an agreement waiving certain of their constitutional rights as a condition of entering the program. The record before us references the fact that the defendant signed such an agreement, but does not contain a copy, and consequently we do not know the extent of the rights he purportedly waived prior to his program participation. But whether or not the defendant's waiver expressly included deprivations of his absolute right to liberty such as those that may have occurred here, and whether or not the defendant had the power to waive these rights (even prior to committing any potentially sanctionable conduct) consistent with the Supreme Court's decision in *Morrissey* and related precedent concerning the Due Process Clause, we may not address the constitutionality of these sanctions because there is no challenge to them before this Court.

-15-

of sustained abstinence." DRUG COURT COMPONENTS at 13. A participant's relapsing drug or alcohol use will almost necessarily entail failed drug or alcohol screenings, missed meetings and appointments, and dishonest behavior designed to hide the relapse from the drug court and insulate the participant from the consequences of his antisocial behavior. Given the program's therapeutic focus, it is difficult to imagine that the Drug Courts Standards Committee envisioned that significant amounts of jail time would be added to the sentences of program participants as sanctions for behavior that the Committee expressly contemplated would be engaged in by "many" of those same participants.

Drug courts are directed to "impose appropriate responses for continuing [alcohol and drug] use." *Id.* In the pursuit of achieving a participant's program compliance, drug court judges should consider the full panoply of positive and negative reinforcement steps and implement a "continuum of responses" to "noncompliant behavior." *Id.* at 14. The record below does not reveal to us whether the drug court in this case tried some of the more measured sanctions provided for in the guidelines – *viz.*, admonishment from the bench, program demotion, increased testing and court appearances, courtroom confinement, increased monitoring, fines, and community service – without success prior to incarcerating the defendant for significant periods. *See id.* Even assuming it did so, however, the approximately six months, in all, imposed in this case would appear to be in plain tension with the idea that drug courts should adopt a therapeutic, collaborative, and measured response to a participant's noncompliant behavior. In the future, we trust that judges will do their best to ease this tension by ensuring that the drug court program focuses on drug addiction therapy and treatment, and recognizing that, for good reason, punishment with substantial periods of incarceration is bailiwick of the traditional criminal justice system. When necessary, truly recalcitrant participants may be swiftly returned to the traditional system via the drug court expulsion process.

_____
JOHN EVERETT WILLIAMS, JUDGE

-16-